CLAIR REUTER *et al.*, as Plenary Guardians of the Estate of Paul A. Reuter, a Disabled Person, Plaintiffs-Appellants, v. FREDERICK B. KORB III, Defendant-Appellee.

Second District   No. 2—92—0811

Opinion filed July 15, 1993.—Rehearing denied August 20, 1993.

Paul G. Brinkman, of Wheaton, for appellants.

Lindner, Speers & Reuland, P.C., of Aurora (Jon Yambert, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiffs, Clair and Elizabeth Reuter, as plenary guardians of the estate and person of Paul Reuter (Reuter), a disabled person, brought an action against defendant, Frederick Korb, for injuries to their son occasioned by the alleged negligence of defendant in operating his automobile. Plaintiff sought damages in the amount of $15 million. Defendant's answer included affirmative defenses alleging that Reuter was more than 50% of the proximate cause of the injury or damage for which recovery was sought. The case proceeded to a jury trial. At the conclusion of the evidence presented at trial, the court granted defendant's motion for a directed verdict.

On appeal, plaintiffs contend: (1) that the trial court abused its discretion in granting a directed verdict in defendant's favor at the close of the evidence; (2) that the trial court abused its discretion in granting defendant's motion *in limine* to bar evidence of defendant's

drinking; (3) that the trial court abused its discretion in granting defendant's motion to bar testimony by plaintiffs' accident reconstruction expert; and (4) that the trial court erred in failing to strike defendant's affirmative defenses because section 2—1116 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1116), which formed the basis of those defenses, is unconstitutional.

Prior to trial, defendant filed a motion *in limine* to bar plaintiffs' expert James O'Donnell, a pharmacology consultant and registered pharmacist, from testifying regarding any ingestion of alcohol or intoxication on the part of defendant. Defendant had admitted to the police, following the accident, that he had consumed two cans of beer that evening. Defendant had also agreed to a breathalyzer test; the breathalyzer reading was .05. O'Donnell had extrapolated the .05 reading up to a .075 blood-alcohol level at the time of the accident, based upon the average blood-alcohol dissipation rate. If allowed to testify, O'Donnell planned to express his opinion that defendant had a blood-alcohol level of .075 at the time of the accident, that defendant drank at least three 12-ounce cans of beer prior to the accident, and that most individuals demonstrated the effects of alcohol at a level of .075.

Attached to defendant's motion to bar O'Donnell's testimony was a portion of the deposition testimony of Douglas Dinerstein, a passenger in defendant's car on the night of the accident. Dinerstein opined that defendant was not intoxicated or under the influence of alcohol that night. Also attached were portions of the depositions taken from three police officers who were at the scene shortly after the accident. Two of the officers, Brian Furman and Lisa Brogan, testified that defendant was in good physical condition and not slurring his words. The third officer, Alan Pierce, who administered defendant's breathalyzer test as well as spoke with defendant at the accident scene, also stated that defendant was not slurring his words. Additionally, Officer Pierce said that he observed nothing about defendant's behavior which indicated that defendant was in any manner intoxicated.

A portion of defendant's deposition testimony also accompanied the motion *in limine*. That testimony indicated that defendant had consumed a couple of beers on the evening in question, one sometime prior to leaving McCormick Place between 10 and 10:30 p.m. and the other during the drive from McCormick Place to Naperville. However, defendant did not feel impaired as he drove home nor did he feel the effects of the beer.

Plaintiffs filed a response to defendant's motion *in limine*, arguing that O'Donnell's retrograde extrapolation could be validly used to

find that defendant had an alcohol level of .075 at the time of the accident. Plaintiffs asserted that, based on this level of alcohol concentration, O'Donnell would be able to state that defendant was under the influence of alcohol at the time of the occurrence. This testimony regarding defendant's alcohol consumption was, according to plaintiffs, probative of the issue regarding why defendant never saw Reuter until the moment of impact.

A hearing was conducted on defendant's motion *in limine*. The trial court granted defendant's motion, pointing out in its letter of opinion that plaintiffs' expert, O'Donnell, did not intend to render at trial any opinions as to defendant's intoxication other than to say that in most individuals a .075 alcohol concentration, which O'Donnell arrived at through retrograde extrapolation, indicates that an individual is under the influence. The trouble with this opinion, the court stated, was that O'Donnell could not "tag that opinion to this defendant." Without any evidence of erratic driving on defendant's part, the court found that it was "too speculative" to allow O'Donnell to "testify in a 'generic' sense as to what most individuals would be like if they tested .05 sometime following the occurrence [in question]."

Plaintiffs filed a motion to reconsider, asking the court to reconsider and vacate its prior order granting defendant's motion *in limine*. The trial court heard the motion and, subsequently, denied it, stating that O'Donnell "does not have any opinion as to whether defendant was 'intoxicated' at the time of the occurrence."

Also, prior to trial, defendant filed a motion *in limine* to bar the testimony of plaintiffs' expert, Roland Ruhl, an expert in accident reconstruction and in the field of vehicle dynamics. Ruhl was to express his opinion regarding the mechanics of the accident, *e.g.*, defendant's perception and reaction time, the dynamics of evasive actions, the properties of high beam and low beam headlights, and the physics and mechanics of the impact to Reuter. Defendant argued that the mechanics of the accident were within the understanding of the average juror, that many of Ruhl's opinions were based upon defendant's blood-alcohol level which had already been barred through previous rulings of the court, that some of Ruhl's opinions were conclusionary in nature and invaded the province of the jury, and that eyewitness testimony to the accident existed.

Plaintiffs filed a response to defendant's motion to bar Ruhl's testimony. Plaintiffs contended that Ruhl's engineering analysis, which constituted the basis for his conclusions, was beyond the knowledge of the average juror and would aid the jury in understanding what driv-

ing maneuvers were available to defendant at and before the time of the accident.

Defendant filed a reply in support of his motion to bar Ruhl's testimony, specifically pointing out why Ruhl's opinions should not be allowed into evidence. Additionally, defendant pointed out that Dinerstein, the passenger in defendant's car, could and would provide eyewitness testimony of the accident; that police officers, who arrived on the scene within minutes of the accident, could and would testify as to road conditions, the layout of the area, the physical damage to the vehicle, and the lighting conditions; and that numerous photographs of the scene and of the vehicle involved had been taken. Defendant concluded that Ruhl's testimony would add very little, if anything, to the jurors' understanding of the issues.

The trial court granted defendant's motion to bar Ruhl's testimony, stating in its opinion letter that Ruhl was relying upon numerous assumptions, all of which were within the province of the jury. Therefore, the court determined, Ruhl's testimony would not aid the jurors in resolving the instant dispute.

The case proceeded to trial on May 4, 1992. The testimony at trial revealed that on the evening of January 7, 1989, defendant left McCormick Place, where he had been working, between 10 and 10:30 p.m. Accompanying defendant was Douglas Dinerstein, who also worked at McCormick Place and who had been traveling to and from work with defendant for several weeks. At approximately 11:25 p.m. defendant was traveling southbound on Washington Street in Naperville. Defendant had traveled this street on many prior occasions. He was proceeding through a curve at about 45 miles per hour, the posted speed limit, when suddenly Reuter appeared in the center of defendant's lane of traffic.

According to defendant's testimony, he first saw Reuter just before the impact. At the time, Reuter was about 10 feet in front of defendant's car. Defendant related that Reuter appeared to be "jostling" back and forth in the roadway. His hands went up, and then the impact occurred. Defendant believed that, prior to the impact, he had moved his foot toward the brake but the car had not slowed down before striking Reuter. Defendant stated that he was not distracted as he drove through the curve, that he was looking out the front windshield, and that his headlights were illuminated. Defendant recalled that it was dark and that there was no overhead lighting.

After striking Reuter, defendant stopped his car and walked back to where Reuter lay. Reuter was lying so that one-half of his body was on the roadway and one-half was on the shoulder. Defendant directed

some cars traveling in the southbound lanes around Reuter. A police car was one of the cars. Defendant had a conversation with the officers at the scene.

At about 11:20 p.m. Officer Lisa Brogan of the Naperville police department, who was on patrol duty, had traveled Washington Street in the area of the accident. At the time, she had not observed any pedestrian in the roadway. Brogan had then parked in the parking lot of Moser Lumber, a store located at the intersection of Washington Street and Ring Road. Brogan stated that, while parked in that location, a vehicle pulled up alongside her. The driver of that vehicle told her that he had just passed a pedestrian walking in the roadway on Washington Street and trying to flag down cars. According to Brogan, the driver told her that he had had to swerve to avoid the pedestrian and that he was reporting the incident to the officer because he was afraid that the pedestrian was going to get hit by a car.

Officer Brogan testified that she immediately headed southbound toward the area of Washington Street where the driver had said he swerved to avoid hitting the pedestrian. By the time the officer arrived at that area, the pedestrian, Reuter, had been hit by defendant's car. Officer Brogan summoned the traffic unit, the paramedics, and more squad cars to block off the roadway.

After Reuter had been removed from the scene, Officer Brogan spoke with defendant. The officer recalled that defendant was visibly upset and that he told her that Reuter had appeared to have come out of nowhere and that he (the defendant) did not have time to brake or do anything; he just struck him. Officer Brogan described the area where the accident occurred as "a notoriously dark stretch of road." The area is very rural with fields on one side of the roadway and trees on the other side. There was no artificial lighting in the area. The officer stated that she also spoke with the passenger in defendant's car, Doug Dinerstein. The officer recalled that Dinerstein's statement was similar to defendant's in that he also said that he did not see Reuter until almost on impact.

Officer Alan Pierce, a traffic officer for the Naperville police department whose duties included investigating serious personal injury accidents, testified that he was summoned to the scene of the accident. The officer stated that he had received formal training in accident investigations at the traffic institute of Northwestern University. The officer made an investigation of the scene, spoke with defendant and Dinerstein, and, subsequently, prepared a written report and diagram of the scene. He also took photographs of the scene and of defendant's vehicle.

The officer recalled that defendant said that he had been traveling southbound on his way home from work and had just started into the curve when a form appeared in front of him, seemingly out of nowhere. Defendant told the officer that he had had no time to take any evasive action prior to the impact. According to Officer Pierce, Dinerstein's version of the occurrence was nearly identical to defendant's with the exception that Dinerstein was certain that the form which appeared in front of them was a person. Neither defendant nor Dinerstein indicated that defendant had been distracted in any manner prior to the accident.

Officer Pierce stated that as a car entered the curve involved here its headlights would be into the inside of the curve and not shining on the edge of the road. The officer also said that the nearest artificial lighting was almost 1,400 feet away. It was the officer's belief that defendant had told the officer that he had had his low beams on at the time of the accident although the officer was not absolutely certain of that fact. Also, Officer Pierce stated that no law existed in Naperville requiring a driver to drive with his high beams illuminated.

The officer recalled that at the time of the accident Reuter was wearing blue jeans and a dark top.

According to Officer Pierce, the shoulders on each side of Washington Street measured about three feet and were walkable, *i.e.*, not covered with snow, on the night of the accident. Additionally, there was no indication from his reconstruction of the accident that defendant's car had ever left the traveled portion of the roadway before he brought it to a stop.

The officer further testified that the posted speed limit in the area of the accident was 45 miles per hour and nothing indicated to the officer that defendant was exceeding the speed limit prior to the accident. At that speed, the officer stated, a car travels roughly 65 or 66 feet per second. According to Officer Pierce, the reaction time of a driver of defendant's age and experience to take his foot off the accelerator and apply it to the brake pedal would be about three seconds. It would take that amount of time to recognize the danger and begin the mechanical movement of moving the foot from the gas pedal to the brake pedal. The officer also said that a person confronted with an unexpected situation, like the instant one, may think he applied the brakes when, in actuality, he had not yet completed that movement prior to the impact. The officer acknowledged that no one knows if Reuter was just standing in the roadway before the accident occurred.

Both plaintiff Clair Reuter and Dr. Anthony Altimari, Paul Reuter's physician, testified as to Reuter's current physical condition. Dr. Altimari stated that Reuter is in a persistent vegetative state as a result of the accident.

Doug Dinerstein testified that, prior to the accident, he had been commuting to work with defendant for about two months. Dinerstein stated that on the night of the occurrence defendant and he left McCormick Place at approximately 10 p.m. When they arrived in Naperville, they drove by the house of defendant's girlfriend to see if she was home. Defendant then proceeded to take Dinerstein home.

Dinerstein recalled that they were traveling southbound on Washington Street, going about 40 miles per hour as they proceeded through a curve. In that area of the roadway it was "very dark" with woods on both sides of the road and no lighting. There were no crosswalks within 300 yards of the accident. Dinerstein stated that he first saw Reuter at about the time of impact. Reuter was in the middle of the southbound lane and about 10 feet away from the car. He was wearing dark clothing.

Dinerstein said that the incident happened so fast he did not have time to say anything to defendant. The amount of time that transpired from the time Dinerstein first saw Reuter until the moment of impact was less than a second. Dinerstein did not feel the car slow down before impact and could not recall whether defendant took any evasive action prior to impact.

According to Dinerstein, defendant stopped the car within a few seconds after the impact. The two men exited the car and walked back toward Reuter. The police arrived almost immediately thereafter.

Dr. Stephen Vogel, director of the division of toxicology at Evanston Hospital, testified regarding the effects of alcohol on a person. The doctor had reviewed records from Edward Hospital where Reuter had been taken after the accident. Dr. Vogel stated that the results of a blood test administered to Reuter indicated that Reuter had a .298 blood-alcohol level at the time of the accident. The doctor testified that Reuter's blood-alcohol level was equivalent to three times the level considered as legally drunk in Illinois.

Dr. Vogel stated that a .298 blood-alcohol level would markedly slow down a person's reaction time. Based upon a reasonable degree of medical certainty, the doctor opined that Reuter was under the influence of alcohol and "significantly impaired" at the time of the accident. According to the doctor, Reuter's judgment, his reaction time, his inhibitions, his risk-taking behavior, and his coordination would have been significantly changed and diminished.

At the conclusion of the evidence defendant moved for a directed verdict. Defendant argued that plaintiffs had failed to show any negligence on defendant's part. Additionally, defendant argued that Reuter was more than 50% comparatively negligent for his injuries. Plaintiff maintained that the jury should be allowed to decide if Reuter was the sole proximate cause or more of a cause of his injuries than defendant. The court granted defendant's motion, finding that no negligence on defendant's part had been shown and that the evidence overwhelmingly indicated that Reuter's own conduct constituted the proximate cause of the accident. This appeal ensued.

■ In this court defendant has filed a motion for leave to file four exhibits which were used extensively at trial but not made part of the record on appeal. We ordered the motion and plaintiff's objections thereto be taken with the case. We address this matter briefly before proceeding with the issues plaintiffs have raised on appeal.

None of the exhibits used at trial can be found in the record. Defendant seeks to submit two blowups of the stretch of roadway where the accident occurred, a blowup depicting the damage to defendant's car as a result of the impact with Reuter, and an enlarged diagram of the accident scene drawn by the police officer who conducted an investigation and prepared a detailed report of the accident. Plaintiffs maintain that the submission of these selected exhibits without complete submission of all the exhibits would effectively imply that these exhibits were more important than the other evidence. We do not agree. The omitted exhibits contributed little to the understanding of the case.

Moreover, we find it particularly interesting that most of the exhibits defendant seeks to add to the record were plaintiffs' exhibits and were heavily relied upon by plaintiffs in presenting their case. We cannot, therefore, comprehend why plaintiffs maintain that the exhibits are not necessary to understand fully the testimony of the witnesses. A careful reading of the record indicates that the exhibits are essential to our review of the case. Accordingly, pursuant to Supreme Court Rule 366 (134 Ill. 2d R. 366), we allow defendant's motion to add to the record the four exhibits specified in that motion.

■ Plaintiffs first contend that the trial court abused its discretion in granting a directed verdict in defendant's favor at the close of all the evidence. A verdict may be directed when all the evidence viewed in its aspect most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.

In the instant case the overwhelming evidence showed that the proximate cause of Reuter's injuries was his own conduct. Although plaintiffs rely on the trial court's statement, in directing the verdict, that some inference of negligence may be drawn from defendant's failure to see Reuter in the roadway, the court also stated that it did not believe in that inference. Moreover, any such inference was not sufficient to overcome a directed verdict. The presence of some evidence of a fact which, when viewed alone may seem substantial, does not always, when viewed in the context of all of the evidence, retain such significance. (*Pedrick*, 37 Ill. 2d at 505.) An individual's constitutional guarantee to have a dispute resolved by the jury is not impaired by direction of a verdict despite the presence of some slight evidence to the contrary for the right to a jury trial includes the right to a jury verdict only if there are factual disputes of some substance. (37 Ill. 2d at 505.) Such was not the case here.

The evidence showed that defendant was traveling between 40 and 45 miles per hour through a curve on Washington Street in Naperville in an area that was "notoriously dark," as stated by police officer Lisa Brogan. Defendant said that he had his headlights on and that he was watching where his headlights were aiming. Both defendant and his passenger, Dinerstein, recalled that when they first saw Reuter, who was wearing dark clothing, he was right in front of them, about 10 feet away from the car. Defendant was not certain whether he applied his brakes and estimated that he had only a second or less to brake before impact. Dinerstein stated that defendant had no time to alter his course or to brake before impact and that less than a second transpired from the time they first saw Reuter until the impact occurred.

Officer Alan Pierce, who had received formal training in accident investigations, testified that one second prior to the accident defendant's headlights would not have been shining on something located on the road but would have been shining into the inside of the curve. Additionally, he stated that a car moving at 45 miles per hour would travel 65 to 66 feet per second and that a person of defendant's age and experience would take approximately three seconds to react to the danger and to move his foot from the accelerator to the brake pedal. Given these calculations, defendant would have had no time to avoid the accident.

The officer also testified that the roadway had shoulders made up of some asphalt plus gravel which provided about three feet of space on which to walk. At the time of the accident the shoulders were not covered with snow and were walkable.

Officer Lisa Brogan testified that she and another officer had driven through the area of the accident shortly before the occurrence and that they had observed no pedestrian in the roadway. A few minutes later Officer Brogan was positioned in a nearby location when a vehicle pulled up alongside her and told her that a pedestrian was walking in the roadway trying to flag down cars.

The evidence showed that at the time of the accident Reuter had a blood-alcohol level of .298, three times the level which is considered to be legally drunk. Dr. Stephen Vogel, defendant's toxicologist, opined that Reuter was under the influence of alcohol and significantly impaired at the time of impact. Dr. Vogel stated that at his level of intoxication Reuter's judgment, reaction time, inhibitions, risk-taking behavior, and coordination were significantly diminished.

In light of this testimony, it is clear that there were no substantial factual disputes for the jury to resolve. Any evidence supporting Reuter lost its significance when viewed in the context of all the evidence. Here, as defendant points out, he was driving his vehicle in a normal manner but never had the opportunity to avoid Reuter who, contrary to plaintiffs' assertion, was not where he should have been. As required by law, Reuter was not walking on the shoulder of the roadway as far as practicable from the edge of the roadway (Ill. Rev. Stat. 1989, ch. 95½, par. 11—1007(b)), he did not yield the right-of-way to vehicles upon the roadway (Ill. Rev. Stat. 1989, ch. 95½, par. 11—1007(d)), and he did not refrain from walking upon the roadway while under the influence of alcohol (Ill. Rev. Stat. 1989, ch. 95½, par. 11—1010).

The cases relied upon by plaintiffs are distinguishable. Unlike the instant case, these cases involved: a minor child victim to whom no negligence could be imputed and whose presence should have been known to the defendant (Mort v. Walter (1983), 98 Ill. 2d 391; Wallace v. Weinrich (1980), 87 Ill. App. 3d 868); a defendant with an unobstructed view of 600 to 700 feet between the 14-year-old plaintiff and him prior to striking the plaintiff, who had trotted out into the road to retrieve a tennis ball (Harris v. Day (1983), 115 Ill. App. 3d 762); a defendant driving with defective headlights who failed to see a 15-year-old jogger in light clothing jogging down the center of the road at night with a companion (Campbell v. Morine (1992), 223 Ill. App. 3d 678); and a defendant who struck a minor plaintiff in broad daylight whom he first noticed from a distance of 100 to 150 feet away and who then crossed the street in the middle of the block when defendant was 40 to 60 feet away (Newton v. Meissner (1979), 76 Ill. App. 3d 479). In the instant case, the victim was not a minor but a

31-year-old highly intoxicated adult who suddenly appeared in front of defendant's car in a pitch-dark area of the roadway. He was not in an area where defendant should have known or expected a pedestrian to be, nor was he at a distance that allowed defendant to honk, slow down, or swerve. Moreover, there was testimony that defendant was looking straight out his windshield in the direction that his headlights, which were operating properly, were shining when Reuter unexpectedly appeared out of nowhere.

In arguing defendant's motion for a directed verdict, defense counsel contended that the trial court had the discretion to take the case from the jury where no reasonable person could differ on the proposition that plaintiff was more than 50% comparatively negligent. Under section 2—1116 of the Code of Civil Procedure, a plaintiff is not entitled to any damages for his personal injuries if he is found to be more than 50% at fault for those injuries. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1116.) Thus, under this statute, even if defendant was negligent in some manner, he would not be liable for any of Reuter's injuries as long as Reuter's contributory fault constituted more than 50% of the proximate cause of his injuries.

Here, it was readily apparent from the evidence that Reuter was more than 50% comparatively negligent in causing his injuries and, thus, not entitled to any recovery from defendant. Given the doctrine of comparative negligence, as well as the fact that all the evidence overwhelmingly favored defendant, we find that it was within the trial court's discretion to take the case from the jury and direct a verdict in defendant's favor.

In their second contention, plaintiffs contend that the trial court abused its discretion in granting defendant's motion *in limine* to bar evidence through expert testimony of James O'Donnell, a pharmacist, of defendant's drinking on the night of the occurrence. Defendant asserts that plaintiffs have waived this issue on appeal because they failed to make an offer of proof at trial regarding what O'Donnell's testimony would be if allowed to testify. We disagree with defendant.

Prior to trial, the court conducted a hearing on defendant's motion *in limine*. Attached to defendant's motion was the deposition of James O'Donnell which contained testimony regarding defendant's alleged intoxication. Plaintiffs' response to defendant's motion set out what O'Donnell's testimony would show. The court heard arguments on defendant's motion and plaintiffs' response and, thus, was well informed regarding what the evidence would be if O'Donnell was allowed to testify. The court's subsequent letter of opinion specifically

addressed O'Donnell's testimony and stated why the court was excluding it from trial. In reaching its decision, the court considered the arguments and motions of the parties, complete with supporting documents.

An offer of proof may be necessary to assess both the admissibility of the proffered evidence and the prejudice resulting from the exclusion. (*Scoggin v. Rochelle Community Hospital* (1988), 176 Ill. App. 3d 648, 651.) These matters, however, were presented to and considered by the court in connection with defendant's motion *in limine*. Thus, plaintiffs could have reasonably presumed that the trial court's ruling excluding O'Donnell's testimony was conclusive and that raising it again at trial would prove futile. Given the particular circumstances here, we believe plaintiffs' presumption was reasonable and, therefore, plaintiffs did not waive the admissibility of O'Donnell's testimony by failing to make an offer of proof at trial.

Following the accident, defendant admitted to police that he had had two beers during the evening. As a result, a breathalyzer test was administered at the police station. The .05 result of the test gave rise to the presumption that defendant was not under the influence of alcohol at the time of the accident. (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.2(b)1.) O'Donnell, using a theory known as retrograde extrapolation, opined that defendant's blood-alcohol level at the time of the accident was .075. This opinion was based on the facts that defendant had consumed two beers, the last within 45 minutes before the accident, and that the breathalyzer test had not been given until 90 minutes after the accident.

To arrive at the .075 figure, O'Donnell assumed that the alcohol defendant had drunk had been absorbed by his body and that he was in the elimination phase of the blood-alcohol curve at the time of the breathalyzer test. Using an average blood-alcohol dissipation of 15 milligrams per hour, O'Donnell calculated that defendant's alcohol dissipation 90 minutes after the accident would be 22 to 23 milligrams per hour. Adding those figures to the .05 breathalyzer reading, O'Donnell estimated defendant's blood-alcohol level to be .075 at the time of the accident. Based on this extrapolation, O'Donnell was of the opinion that defendant "may have been" under the influence of alcohol at the time of the accident.

Relying largely on *Cuellar v. Hout* (1988), 168 Ill. App. 3d 416, a case in which O'Donnell had testified, plaintiffs argue that O'Donnell should have been allowed to testify in the instant case regarding the theory of retrograde extrapolation and the opinions O'Donnell formulated regarding defendant's alcohol concentration by applying that

theory. However, as defendant points out, a significant difference existed between O'Donnell's testimony in *Cuellar* and his proposed testimony here. In *Cuellar*, O'Donnell testified that the plaintiff was intoxicated at the time he was injured. In the instant case, O'Donnell was unwilling to make a similar statement.

In *Cuellar*, the results of a blood-alcohol test administered to the plaintiff following the accident in question revealed an alcohol concentration of .064. Using retrograde extrapolation, O'Donnell calculated the plaintiff's alcohol level to be .104 at the time of the accident and opined that the plaintiff was intoxicated at the time of the accident. (168 Ill. App. 3d at 422.) The blood-alcohol level of .104 gave rise to the presumption that plaintiff was under the influence of alcohol. (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.2(b)(3).) Based on that presumption, coupled with O'Donnell's opinion that defendant was intoxicated at the time of the accident, this court concluded that O'Donnell's testimony regarding retrograde extrapolation and his opinions based thereon were admissible.

In the instant case, the .075 alcohol concentration arrived at through O'Donnell's extrapolation did not give rise to the same presumption arrived at in *Cuellar*. In fact, it did not give rise to any presumption concerning whether defendant was or was not intoxicated. See Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.2(b)(2).

Although an alcohol concentration in excess of .05 but less than .10 does not give rise to any presumption that a person was or was not under the influence of alcohol (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.2(b)(2)), it may be considered with other competent evidence in determining whether a person was under the influence of alcohol. Here, there was no other evidence of intoxication. Attached to defendant's motion *in limine* were portions of depositions taken from three police officers. Two of the officers, who arrived at the scene shortly after the accident, testified that defendant was in good physical condition and not slurring his words. A third officer, who administered defendant's breathalyzer test as well as spoke with defendant at the scene, stated that he observed no behavior indicating that defendant was intoxicated. Also attached to defendant's motion was a portion of the deposition testimony of defendant's passenger, Dinerstein, on the night of the accident. Dinerstein testified that defendant was not intoxicated or under the influence of alcohol that night.

Additionally, unlike the testimony in *Cuellar*, O'Donnell's testimony at his deposition revealed that he would not testify at trial that defendant was intoxicated at the time of the accident:

"Q. [Mr. Rice, defendant's counsel] Okay, now then have you seen any information whatsoever indicating at the time of the accident Mr. Korb was intoxicated?

A. [O'Donnell] No.

Q. Have you seen any information whatsoever to indicate that Mr. Korb was physically or mentally impaired at the time of the accident?

A. Any information?

Q. Any information in your file.

A. No.

Q. All right. Am I therefore correct based upon a reasonable degree of certainty, you do not have an opinion as to whether Mr. Korb was intoxicated at the time of the accident?

A. Correct, my opinion is that he may have been under the influence.

Q. All right. But you don't have an opinion as to whether he was intoxicated, correct?

A. Correct.

* * *

Q. Okay. Once again though, sir, it's correct that as far as Mr. Korb specifically, and not generally as you indicate in your report, 'other individuals', as far as Mr. Korb specifically you do not have an opinion as to whether or not he was intoxicated at the time of this accident, correct?

A. That's correct.

Q. All right, and that's based upon a reasonable degree of certainty, correct?

A. I usually only have a reasonable degree of certainty of opinions that I have. I mean I don't have an opinion as to any intoxication. So there is really no certainty that applies to that.

Q. All right, bottom line being you wouldn't render an opinion at the time of trial that he was intoxicated, is that right?

A. That's right."

Generally, evidence that a person has consumed alcoholic beverages is not, by itself, admissible; there also must be evidence to show that the drinking resulted in intoxication. (*Rice v. Merchants National Bank* (1991), 213 Ill. App. 3d 790, 798.) Such evidence was lacking here. Plaintiffs' expert did not have an opinion whether defendant was intoxicated on the night of the accident. The most he opined was that defendant "may have been under the influence," and that opinion was based on the results of the expert's retrograde extrapolation

which, unlike the extrapolation in *Cuellar*, did not raise defendant's alcohol concentration to a level which permitted a presumption of intoxication. Additionally, defendant and his passenger both testified that defendant was not intoxicated, and that testimony was supported by police officers who knew defendant had consumed alcohol yet observed no behavior indicating that defendant was under the influence. In view of the lack of any supporting evidence of any intoxication, the trial court did not abuse its discretion in granting defendant's motion to bar any evidence of defendant's alcohol consumption.

■ Next, plaintiffs contend that the trial court abused its discretion in granting defendant's motion *in limine* to bar the testimony of their accident reconstruction expert, Roland Ruhl. Plaintiffs maintain that Ruhl's testimony would have aided the jury in understanding what driving maneuvers were available to defendant at and before the accident. Defendant argues that such matters were within the understanding of the average juror and that Ruhl's opinions would have invaded the province of the jury.

Initially, defendant contends that plaintiffs have waived this issue on appeal by failing to make an offer of proof at trial regarding the opinions of Ruhl which plaintiffs sought to be admitted. We have already addressed this identical argument as it applied to the testimony of plaintiffs' expert, O'Donnell. As in that instance, the trial court in ruling on defendant's motion to bar Ruhl's testimony at trial had before it defendant's motion, plaintiffs' response, and the expert's deposition testimony. Consequently, the court was well apprised regarding what the evidence would be if Ruhl were allowed to testify.

An offer of proof may be necessary to assess both the admissibility of the proffered evidence and the prejudice resulting from the exclusion. (*Scoggin v. Rochelle Community Hospital* (1988), 176 Ill. App. 3d 648, 651.) But, here, where at the time the court ruled on defendant's motion it had before it for its consideration the necessary information to make such an assessment, we cannot say that plaintiffs' failure to make an offer of proof at trial constituted a waiver. Any offer of proof was likely to pertain to the same evidence already proffered to the court at the time it considered defendant's motion *in limine* to bar Ruhl's testimony.

Additionally, we find no merit to defendant's claim that plaintiffs have failed to point out which opinions of Ruhl's the court should have allowed him to present at trial. We move on, therefore, to our consideration of plaintiffs' contention that the court should not have barred Ruhl from testifying.

The modern standard for the admissibility of expert testimony is whether such testimony would aid the jurors' understanding of the facts. (*Ketchum v. Dura-Bond Concrete, Inc.* (1989), 179 Ill. App. 3d 820, 831.) In instances such as the case at bar, a fundamental reason for the exclusion of reconstruction testimony has been the court's feeling that jurors are well aware of driving situations and do not require the assistance of experts in reaching their decisions. (*Augenstein v. Pulley* (1989), 191 Ill. App. 3d 664, 680.) Whether to admit evidence which reconstructs the scene of an accident rests within the sound discretion of the trial judge, whose decision will not be disturbed absent a clear showing of an abuse of that discretion. *Wiedemann v. Industrial Erectors, Inc.* (1985), 137 Ill. App. 3d 47, 56.

In the instant case, Ruhl's expert opinions were not required to aid the jury in reaching a decision. The opinions which Ruhl intended to give at trial as expressed during his deposition were:

1. That the accident was avoidable if the defendant had exercised reasonable care.

2. That the defendant's failure to exercise reasonable care was a proximate cause of the accident.

3. That the defendant's avoidance maneuver should have been to swerve rather than to brake, as the avoidance travel distance for swerving is 40% less than for braking.

4. That had the defendant been using the high beams of his headlights, the distance for detection of the pedestrian would have been 2½ times greater and would have allowed defendant to swerve or stop.

5. That the defendant had to have observed Reuter at a minimum of 65 feet prior to the impact rather than at 10 feet as he related to the police, since defendant thought he had begun braking prior to striking defendant.

6. That the defendant's blood-alcohol level contributed to his failing to avoid striking the plaintiff.

7. That the defendant failed to exercise due care to avoid colliding with the pedestrian and did not exercise proper precautions upon observing an obviously intoxicated pedestrian in the roadway.

Some of these opinions were conclusional, *e.g.*, defendant did not exercise reasonable care, as plaintiffs admit in their brief, and would have been inappropriate since they would have invaded the province of the jury. Also, one opinion, that pertaining to defendant's alcohol level, was based on information which had been previously barred from trial and, therefore, could not have been presented to the jury.

Additionally, Ruhl's opinion that defendant should have swerved rather than braked was, in actuality, not his opinion but that of an associate of his who had calculated that the available travel distance for swerving was 40% less than for braking.

Although Ruhl was of the opinion that defendant would have had a greater detection distance had he been using his high beams as he traveled through the area where the accident occurred, that opinion was based on the assumption that Reuter was standing in the road at all times relevant to the occurrence. Additionally, Ruhl acknowledged that the greater detection distance with high beams assumed a straight and level roadway. Neither of these assumptions, however, was shown to be true by the testimony of the other witnesses.

Both eyewitnesses to the accident, defendant and Dinerstein, stated that they did not see Reuter until almost the moment of impact. He appeared in the middle of their lane and was about 10 feet from the car. Defendant said that Reuter appeared to be "jostling" back and forth and raising his arms and that he (defendant) was unable to swerve before impact. Dinerstein recalled that defendant had no time to alter his course or to brake. Both defendant and Dinerstein remembered that the roadway curved where the impact occurred and that there were no lights in the area. Dinerstein stated that there was no background against which to see Reuter because it was dark and the roadway in that area was flanked by woods on either side of it. Additionally, Dinerstein recalled that Reuter was wearing dark clothing.

Officer Lisa Brogan, who arrived at the scene shortly after the accident occurred, described the area where the accident occurred as "a notoriously dark stretch of road." Brogan had proceeded to the area after being stopped by a motorist who said that there was a pedestrian walking in the middle of the roadway trying to flag down cars and that the motorist had had to swerve to avoid him.

Officer Alan Pierce, a specialist in the investigation of serious personal injury accidents such as the instant one, related that the nearest artificial light to the scene of the accident was 1,400 feet away. The officer stated that he believed defendant told him that defendant had had his low beams on at the time of the impact, but the officer was not absolutely certain of that fact. Nevertheless, Pierce stated that there was no local requirement that an individual drive with his high beams illuminated.

Defendant's expert, Ruhl, also acknowledged that no law required an individual to use his high beams. Moreover, Ruhl himself stated that with his low beams on defendant would have been able to see 150

to 200 feet in front of him. If Reuter had been just standing in the road, as Ruhl assumed, defendant would have seen him sooner and been able to stop or at least to swerve to avoid Reuter. The fact that neither defendant nor Dinerstein saw Reuter until just before the impact implies that he walked right into their path.

If allowed to testify, Ruhl also intended to give his opinion that defendant had to have observed Reuter at a minimum distance of 65 feet rather than 10 feet, as related by defendant and Dinerstein. Ruhl's calculation was based on defendant's statement that he began braking prior to striking Reuter and on the fact that defendant said a second or less transpired from the time he first observed Reuter until the instant of the impact.

Defendant also stated, however, that he thought he had moved his foot from the accelerator to the brake pedal but that he was not certain whether he applied the brake. He remembered that the car did not slow down at all before the impact. Officer Pierce, as a trained accident investigator, stated that it would have taken defendant three seconds to recognize the danger, understand it, and begin to make the motion of moving his foot from the accelerator to the brake pedal. Given this fact, along with the facts that a car travels about 65 feet per second at 45 miles per hour and that both defendant and Dinerstein said that Reuter was only 10 feet away when they first saw him, defendant would not have had sufficient time to apply the brakes. Moreover, Pierce testified that in an unexpected situation like the instant occurrence, an individual may think he has applied the brakes because that is what his body is telling him to do when, in reality, he has not even moved his foot to the brake prior to the occurrence. In the instant case it is likely that defendant never even had the opportunity to brake before striking Reuter.

The last opinion Ruhl intended to give was that defendant failed to exercise due care to avoid colliding with Reuter and to exercise proper precautions upon observing an obviously intoxicated pedestrian in the roadway. Ruhl, however, had not reached an opinion regarding what percentage of the general population would have been able to avoid the accident as defendant confronted it. He did opine that 50% of the population would have been able to swerve to avoid striking Reuter. This opinion, however, once again assumed that Reuter had been standing still in the middle of defendant's lane of traffic prior to the accident and that defendant, therefore, could have seen Reuter much sooner than defendant and Dinerstein testified they had seen the victim.

Ruhl admitted that he never inspected the scene of the accident. He had no courses dealing strictly with reconstructing accidents, nor had he participated in any traffic institute courses such as Officer Pierce. During his investigation, Pierce had made a diagram of the accident scene and the location of Reuter as well as taken several photographs of the scene and of the damage to defendant's vehicle. These items were to be entered into evidence and given to the jury to use during deliberations.

There was no evidence that defendant was exceeding the speed limit, driving in the wrong lane of traffic, or not using his headlights. There was eyewitness testimony in the form of defendant's testimony and that of his passenger, Dinerstein, as to how the accident occurred and where it occurred. This testimony, as well as that of the officers and of Dr. Stephen Vogel, defendant's expert in toxicology, regarding the degree of impairment in one with the alcohol concentration of Reuter on the night of the accident was sufficient to supply the jury with the information it needed to understand the facts of the occurrence.

Although Ruhl was qualified as an expert, his opinions, as the trial judge pointed out in his letter of opinion, were based upon numerous assumptions, *e.g.*, the advisability of using high beams rather than low beams, the position of Reuter in the roadway prior to impact, defendant's reaction time, and defendant's ability to swerve and avoid Reuter. These assumptions, the court determined, were based on matters within the province of the jury and would not have aided it in the resolution of the dispute. We agree and find that the trial court did not abuse its discretion in barring the testimony of Ruhl.

■ In their final contention plaintiffs argue that the trial court erred in failing to strike defendant's affirmative defenses which plaintiffs allege were based on the "51%" rule set forth in section 2—1116 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1116). Plaintiffs maintain that section 2—1116 is unconstitutional because, in passing that statute, the legislature violated the separation of powers doctrine of the Illinois Constitution. (Ill. Const. 1970, art. II, §1.) Specifically, plaintiffs contend that since our supreme court established the doctrine of comparative fault in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, only it could modify that doctrine. Consequently, plaintiffs assert, the legislature's passage of section 2—1116, which modified the pure comparative negligence rule established by the court, violated the separation of powers doctrine.

Before addressing this issue, we note first that plaintiffs' motion to strike defendant's affirmative defenses makes no mention of sec-

tion 2—1116 or its alleged unconstitutionality. Rather, the motion merely denies that Reuter's negligence was the proximate cause of his injuries, as defendant states in his affirmative defenses. Also, although plaintiffs allude in their brief to a memorandum they filed in support of their motion to strike, we have been unable to locate that memorandum in the record before us. Additionally, it appears from the court's order denying plaintiffs' motion to strike that a hearing was conducted on the motion but no transcript of that hearing was apparently made. Thus, we have no documentation before us indicating that the theory under consideration in this issue is consistent with that espoused in the lower court. Nevertheless, the court's order denying plaintiffs' motion to strike mentions that the motion involved a question of the constitutionality of section 2—1116. Consequently, we will consider plaintiffs' constitutionality issue despite the lack of any evidence in the record that the theory presented by plaintiffs is consistent with that argued in the lower court.

In *Alvis*, our supreme court abolished the doctrine of contributory negligence and adopted, in its place, a "pure" form of comparative negligence. (85 Ill. 2d at 25, 28.) In so doing, the court stated that it was time to make the change in Illinois from contributory negligence to comparative negligence and that the court was acting because the legislature had failed to enact comparative negligence. The court pointed out that the proper relationship between the legislature and the court is one of cooperation and assistance in examining and changing the ·common law to conform with the ever-changing demands of the community. (85 Ill. 2d at 23.) But, the court stated, when there exists a mutual state of inaction in which the court awaits action by the legislature and the legislature awaits guidance from the court, manifest injustice to the public results. (85 Ill. 2d at 23.) In such a situation, the court stated, it is the court's duty to repair that injustice when the legislature has failed to remedy that injustice. 85 Ill. 2d at 23.

In adopting the doctrine of pure comparative fault, the court remedied one injustice but ended up creating another. Following its decision in *Alvis*, Illinois' common law evolved from the harsh concept of contributory negligence, where a plaintiff who was contributorily negligent could recover nothing for his injuries, to a system of total permissiveness, which allowed a grossly negligent, but injured, plaintiff to recover substantial damages from a slightly negligent defendant. As predicted by Justice Underwood in his dissent in *Alvis*, litigation increased following the adoption of the pure comparative fault doctrine, augmenting the burden upon our already overburdened courts

and increasing insurance rates. 85 Ill. 2d at 32 (Underwood, J., dissenting).

Five years after *Alvis*, the legislature acted to reduce the number of lawsuits, the amount of damage awards, and, ultimately, the insurance rates. It enacted section 2—1116 as part of omnibus legislation enacted in response to the "insurance crisis." (Ill. Ann. Stat., ch. 110, par. 2—1116, Historical & Practice Notes, at 120 (Smith-Hurd Supp. 1992).) The purpose of the legislation was to lower escalating insurance rates by reducing recoveries in lawsuits. (Comment, *Modified Contributory Fault & Strict Products Liability: Illinois' Silent Disposal of Misuse & Assumption of Risk Turns Back the Evolution*, 23 J. Marshall L. Rev. 247, 259 (1990) (hereafter *Modified Contributory Fault*).) Section 2—1116 allows a plaintiff who is less than 50% at fault to recover his injuries diminished by his percentage of contributory negligence but bars the substantially negligent plaintiff whose contributory negligence exceeds 50% from obtaining a recovery. The statute precludes plaintiffs from taking advantage of their own wrongs and favors the party whose fault is only a minor cause of injury. *Modified Contributory Fault*, 23 J. Marshall L. Rev. at 256-57.

Plaintiffs maintain that by enacting section 2—1116 the legislature attempted to "reverse the decisions of the court." We do not agree. While the General Assembly may not pass a statute in an attempt to change the result of a decision which has been finally decided as between the parties to a particular case (*Sanelli v. Glenview State Bank* (1985), 108 Ill. 2d 1, 10), it may enact legislation which changes the effect of a prior decision of a reviewing court with respect to cases which have not yet been decided.

In *Sanelli*, plaintiff contended that the General Assembly violated the principle of separation of powers because it attempted to nullify the supreme court's decision in a prior case by enacting the statute in question. The statute applied to conduct occurring prior to its enactment and expressly forbid the result announced in the supreme court's prior decision. Although the statute became effective after the dispute between the parties in *Sanelli* had already been pending in the trial court, the dispute had not yet been decided at the time of its enactment. The supreme court determined that the General Assembly may enact retroactive legislation which changes the effect of a prior decision of the reviewing court with respect to others whose circumstances are similar but whose rights have not been finally decided. (108 Ill. 2d at 10.) This authority, according to the court, extended to decisions in which the law changed by the legislature resulted from a reviewing court's interpretation of the common law as well as from a

reviewing court's interpretation of a statute. (108 Ill. 2d at 10.) We believe the principles set forth in *Sanelli* have equal application to prospective legislation such as section 2—1116 and find, as the supreme court did in *Sanelli*, that the legislature's enactment of the statute did not violate the separation of powers doctrine.

We disagree with plaintiffs' contention that the legislatively created remedy contained in section 2—1116 deprived plaintiffs of a full or adequate remedy. Consistent with the separation of powers principle, the legislature may impose reasonable limitations and conditions upon access to the courts. (*DeLuna v. St. Elizabeth's Hospital* (1992), 147 Ill. 2d 57, 73.) Such standards do not fail on constitutional grounds simply because noncomplying actions, like plaintiffs', may suffer dismissal. 147 Ill. 2d at 73.

We conclude that the trial court did not err in failing to strike defendant's affirmative defenses on the basis that section 2—1116 is unconstitutional.

Accordingly, for all of the reasons stated the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

WOODWARD and COLWELL, JJ., concur.