2023 IL App (1st) 210875

FIRST DISTRICT
SECOND DIVISION
August 8, 2023

No. 1-21-0875

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 16041 |
| | ) | |
| HINIGO OLVERA, | ) | Honorable |
| | ) | Joseph M. Cataldo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Hinigo Olvera was convicted after a bench trial of aggravated driving under the influence of alcohol (DUI) and obstructing justice. We affirm both convictions, over his various challenges to the sufficiency of the evidence.

¶ 2                                    BACKGROUND

¶ 3    Aries Cobian's car broke down in Streamwood. Amherst Powell, Destini Hall, and Hall's child were in the car with her. Cobian and Powell pushed the stalled car for a time while Powell steered. Officer Kisija pulled up behind them, to keep the traffic at bay, and directed them into a parking lot. But the safe harbor proved fatefully temporary. They declined any further assistance, figuring that they could push the car to their final destination nearby. Officer Kisija moved on, and back out they went, into the eastbound traffic on Lake Street (also known as Route 20), just past the intersection with Park Avenue.

¶ 4    Lake Street is a busy thoroughfare. Two lanes of traffic flow in each direction. The road bends somewhat to the right, with a guardrail and heavy vegetation next to the right lane (going

eastbound), where Cobian and Powell pushed the car. At 7:30 p.m. in October, it was dark out, and the streetlights, if any, were sparse. By all accounts, traffic was "heavy." And there was significant road construction, as Lake Street was being repaved at the time. The speed limit in this zone was 45 miles per hour.

¶ 5    Cobian pushed from the rear driver's side, Powell from the rear passenger's side. The car's taillights and hazard lights were on. By Powell's estimation, roughly 15 cars passed them during the two minutes or so that they pushed the car.

¶ 6    Among those passing by was Mary Otto, who noticed a dark pickup truck tailgating her in the left lane. She was not speeding, so neither was the truck, she figured, but it was following her closely enough to make her feel unsafe. Otto saw a "disabled" car in the right lane, just beyond the intersection with Park Avenue, but she did not notice anyone pushing it. She slowed down a little and moved as far to the left as she could in her lane, to leave space between her and the evident hazard.

¶ 7    Around the time that Otto was passing the disabled car, the pickup truck moved even closer behind her, revved its engine, and swerved sharply into the right lane. Otto heard brakes screeching and then a collision, though she did not see it. She did not know if anyone was hurt and continued on her way. She reported the incident to the police a few days later, after she heard on the news that someone had died in the crash.

¶ 8    Just before the crash, Powell also heard "screeching noises" and moved off to the side of Cobian's car. A pickup truck slammed into the back, and the car and Cobian both briefly "flew up" in the air. The collision forced Cobian's car quite a ways forward; Officer Slocum, the first to respond, estimated it was about 20 yards ahead of the pickup truck. Police photos confirmed that the brunt of the impact was to the left rear of the car, where Cobian was pushing. Suffice it

to say that her injuries were gruesome and fatal. Powell's arm was gashed, but he was otherwise fine, as were the passengers (Hall and her child) inside the car, at least as far as we have been told.

¶ 9     Defendant emerged from the driver's seat of the pickup truck. Hall ran out of the car, screaming that defendant killed Cobian. In plain view of Cobian's mangled and unresponsive body, defendant reportedly shrugged his shoulders.

¶ 10     When Officer Slocum arrived, he found defendant standing near the pickup truck. It had significant front-end damage. The windshield was cracked, and inside, what appeared to be hair was stuck in one of the cracks. (It was never tested.) Defendant did not have any visible signs of injury to his head or anywhere else. He was standing straight and did not show any obvious signs of impairment from Officer's Slocum's vantage point, though the officer was not looking for any. But defendant was, oddly, wearing a head lamp—and looking "unusually unfazed" for someone who had just been in a serious crash. Given the circumstances, Officer Slocum believed that standardized field sobriety tests (SFSTs) were in order.

¶ 11     Before administering the tests, Officer Ciaciura spoke to defendant and found that he had glassy, bloodshot eyes and alcohol on his breath. Defendant seemed unsteady as he walked away from his truck, though he was able to stand relatively straight and his speech was not mumbled or blurred. Defendant claimed that he did not have anything to drink since the previous day and agreed to take the SFSTs. Officer Ciaciura administered the Horizontal Gaze Nystagmus (HGN) test, the walk-and-turn test, and the one-leg-stand test. Defendant not only failed all three tests; he repeatedly failed to follow the officer's directions. We will elaborate later.

¶ 12     Officer Ciaciura asked defendant again if he had been drinking. This time, defendant said that he had one beer with lunch, around noon. The officer was taken aback when defendant asked

him what "the girl was doing on the ground." Defendant refused to take a Breathalyzer test and was arrested for DUI.

¶ 13    Officer Ciaciura, and the State following his lead, both attribute to defendant a comment, allegedly made to the officer, to the effect that he was doing his job correctly. The sobriety tests and arrest were recorded, and we can find no such comment on the video. Rather, what we hear is defendant saying, "Do you think you're doing it the right way, what you're doing?" Defendant said this while Officer Ciaciura was handcuffing him.

¶ 14    In any event, the officer took defendant to Saint Joseph Hospital in Elgin, where he again refused to submit to testing. From there, he was taken to the Streamwood police station, and then to Saint Alexius Medical Center, once a search warrant for a DUI kit had been issued. His blood and urine samples were collected at 1:14 a.m., almost five hours after the crash. Defendant's blood alcohol concentration (BAC) at that time was 0.101—above the legal limit of 0.08.

¶ 15    The next day, Streamwood officers reviewed the video from Officer Slocum's dash-cam, which is included in the record on appeal. Shortly after the crash, and before he took the SFSTs, defendant took some items from the cabin of the truck and put them in the bed of his pickup truck. One of them is almost certainly a cooler (as the State described it at trial, without objection from the defense). After meandering around and taking another look inside the cabin, defendant went back to the spot where he put the cooler and started to rummage. He picked up a bottle, cast a few glances around—toward the various emergency personnel on the scene and the squad car parked behind his truck—and threw the bottle into the bushes on the side of the road. Twenty or so seconds later, he threw another item. It also looked like a bottle, though it is not as clear on the video.

¶ 16    Officer Ciaciura went back to Lake Street and searched the bushes. He found an Absolut

Vodka bottle, unbroken, with some liquid still inside. The parties stipulated that defendant's fingerprints were found on the bottle. The second bottle, or other item, was never found.

¶ 17     The defense case largely comprised two expert witnesses. First, the defense introduced a written report from a pharmacologist, Dr. James O'Donnell. In short, Dr. O'Donnell opined that defendant's BAC at the time of the crash could not be extrapolated from the sample taken from him nearly five hours later. His opinion was based principally on the general and well-known uncertainties of what is known as "retrograde extrapolation," but also in part on the failure of the Illinois State Police to document that its laboratory instruments had been properly validated.

¶ 18     Dr. O'Donnell also interviewed defendant and reported the following account of events: defendant claimed that he drank "some beer" when he came home from work around 4 p.m. Later, after leaving his son's house, he found a bottle of vodka in his truck bed and had "a shot" about 10 minutes before the crash.

¶ 19     Second, the defense called Michael Cowsert, a police officer who moonlights as an expert witness in automobile accident reconstruction. Cowsert's testimony was the basis for the defense argument that the sole proximate cause of the crash (and hence Cobian's death) was not defendant's impaired driving, but rather the decision to push Cobian's car in circumstances that made the collision unavoidable, even by a non-impaired driver.

¶ 20     This defense argument lingers on appeal, in the form of a sufficiency challenge, so we will leave the details of Cowsert's analysis until we reach the issue. For now, we will just say that the trial court was skeptical of his assumptions and methods, rejected his conclusions, and found that he generally lacked credibility on the witness stand. To the court's mind, his analysis defied common sense and experience, not least because all the other drivers in the "heavy" traffic on Lake Street managed to avoid the crash that Cowsert deemed unavoidable.

¶ 21    The trial court acquitted defendant on various charges. Based on the issues noted in Dr.

O'Donnell's report, the trial court found that the State failed to prove beyond a reasonable doubt

that defendant's BAC at the time of the crash was 0.08 or more. 625 ILCS 5/11-501(a)(1) (West

2020). The trial court also found that the State did not offer sufficient proof of its allegation that

Cobian was pregnant, and thus acquitted defendant on two counts charging him with proximately

causing the death of her unborn child.

¶ 22    The trial court found defendant guilty on the one remaining aggravated DUI charge,

which alleged that he proximately caused Cobian's death while driving impaired. The trial court

also found that he obstructed justice by removing evidence from his truck and discarding it into

the bushes on the side of the road. Defendant was sentenced to concurrent prison terms of nine

years for aggravated DUI and three years for obstructing justice.

¶ 23                                    ANALYSIS

¶ 24                                        I

¶ 25    To convict defendant of (aggravated) DUI, as charged, the State had to prove that he was

driving or in actual physical control of a motor vehicle while under the influence of alcohol. *Id.*

§ 11-501(a)(2). A driver is under the influence when " 'his mental or physical faculties are so

impaired as to reduce his ability to think and act with ordinary care.' " *People v. Gordon*, 378 Ill.

App. 3d 626, 631 (2007). Defendant argues that the evidence of impairment was insufficient. We

disagree.

¶ 26    A conviction will not be reversed on sufficiency grounds unless the evidence was so

"unreasonable, improbable, or unsatisfactory" that no rational trier of fact, viewing it in the light

most favorable to the State, could accept it as proof beyond a reasonable doubt. *People v. Ross*,

229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The trier of fact's

- 6 -

findings regarding the credibility of witnesses and the inferences to be drawn from the evidence are not conclusive, but they are entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 27    Defendant failed all three field sobriety tests. In the process, he repeatedly failed to follow Officer Ciaciura's instructions. See *People v. Tatera*, 2018 IL App (2d) 160207, ¶ 28 (fact that defendant "was unable to comprehend and follow [officer's] instructions" for sobriety tests supported finding of impairment).

¶ 28    The HGN test revealed a nystagmus—an involuntary jerking motion of the eye as it deviates from center to track a stimulus—in both of defendant's eyes. Perhaps more importantly, the test could not be completed at maximum deviation because defendant was unable to follow the directions.

¶ 29    Officer Ciaciura testified, and the video corroborates, that defendant kept moving his entire head instead of just his eyes and kept disengaging from the stimulus. Each time defendant failed to follow instructions, the officer paused the test, explained the instructions again, and had defendant repeat them back. Though defendant is a native Spanish speaker, he clearly understood the officer. He just could not complete the test as instructed. Ultimately, Officer Ciaciura had to settle for testing at a 45-degree deviation, which revealed a nystagmus in both eyes. That was one indication or "clue" of impairment.

¶ 30    Defendant said he had no medical issues that would prevent him from walking normally during the walk-and-turn test, which he also failed. He failed to walk heel to toe, used his arms to balance himself, stepped off the imaginary line, and failed to stand normally at the start of the test. What's more, he started the test while the officer was still giving him the instructions, as if somewhat oblivious; he took the wrong number of steps, despite counting out loud; and when he reached the "turn" part of the test, he walked in the wrong direction. This, too, indicated

impairment.

¶ 31    During the one-leg-stand test, defendant failed to maintain his balance without using his arms, hopped on one foot, swayed, and put his foot down and his arms out several times. He also failed to count out loud as instructed. After three attempts, Officer Ciaciura ended the test. All in all, defendant showed "compromised coordination and balance," which are "commonly accepted as indicators of an impaired ability to drive." *People v. Lenz*, 2019 IL App (2d) 180124, ¶ 117.

¶ 32    Some five hours later, defendant's BAC was 0.101 and thus above the legal limit (of 0.08). We recognize that a driver's precise BAC at the time of an accident cannot always be reliably extrapolated from a single measurement taken hours later. There is no need to put a fine point on the topic of "retrograde extrapolation" here, since the trial court found reasonable doubt about defendant's BAC on this basis. But that finding aside, his elevated BAC five hours later, when viewed in the context of the evidence as a whole, still supports a finding of impairment. See *People v. Epstein*, 2022 IL 127824, ¶ 25 (delay between driving and BAC testing "go[es] to the weight of the [BAC] evidence and must be viewed in light of the surrounding circumstances").

¶ 33    Defendant was in the presence (and for most of the time, the custody) of the police from the time that Officer Slocum arrived on the scene, within minutes of the crash, until his BAC was tested. So whatever alcohol caused his elevated BAC was consumed earlier. We would find it hard to believe that a perfectly sober defendant decided to get drunk at the scene of a serious traffic accident while waiting for the police to arrive. And he has never made any such claim.

¶ 34    So we can safely infer that he drank before the crash, which leaves only one way around the conclusion that he was drunk at the time of the crash: that he drank right before the crash, so that the alcohol had not yet absorbed into his bloodstream and impaired his faculties. And yet he

drank enough that his BAC was still over the legal limit five hours later.

¶ 35    It is unlikely, at best, that defendant thus threaded the needle with his drinking. And that hypothesis, improbable as it is on its own terms, is hard to square with the rest of the evidence. For one, it is not what he told the police in either description of his drinking that day (in one version, he had nothing to drink; in the other, one beer at noon). He failed all three field sobriety tests. And even before those tests, the officer noted not only alcohol on his breath but that he had glassy, bloodshot eyes, indicating the alcohol was already in his bloodstream and physically affecting him. See *People v. Janik*, 127 Ill. 2d 390, 402 (1989) ("watery eyes" and smell of alcohol are evidence of intoxication). No doubt that helps explain his inability to follow instructions during the sobriety tests, never mind pass them. See *Tatera*, 2018 IL App (2d) 160207, ¶ 28.

¶ 36    Defendant had an open bottle of vodka in his truck, which is obviously incriminating in its own right. See *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 59. The trial court could reasonably infer, as it did, that throwing the bottle into the brush on the side of the road was also evidence of his consciousness of guilt. So too for his refusal to submit to BAC testing at the hospital. *Id.* (His refusal to take a *preliminary* breath test at the scene is another matter, so we will put that aside and not treat it as evidence of guilt. See *People v. Brooks*, 334 Ill. App. 3d 722, 726-29 (2002).)

¶ 37    Then there were defendant's shifting, false, exculpatory statements about his drinking. As noted, he told Officer Ciaciura that he had not had a drink since the previous day, then later revised that story (after failing the sobriety tests) to one 12-ounce beer with lunch, around noon. In his interview with Dr. O'Donnell, defendant claimed he drank "some beer" around 4 p.m. and had "a shot" of vodka about 10 minutes before the crash.

¶ 38    None of these stories explain his over-the-limit BAC at 1 a.m., except, perhaps, the last one. If he drank *a lot* of beer at 4 p.m., it is all but certain that he was impaired when he crashed into Cobian's car around 7:30 p.m. In any event, for all that we do not know about when or how much defendant drank, or what his precise BAC was at the time of the crash, we do know this: defendant was drinking in the hours leading up to the crash, he eventually admitted as much, and he lied, more than once, about the details, in an apparent effort to avoid incriminating himself.

¶ 39    A driver's "indifferent" attitude toward an accident—not to mention a mangled body in the street—may also be considered circumstantial evidence of impairment. *People v. Allgauer*, 114 Ill. App. 2d 405, 407 (1969). The same is true for a driver's confusion or lack of awareness regarding the evident facts of the situation. See *Janik*, 127 Ill. 2d at 397. Here, defendant reportedly shrugged when he first stepped out of his truck and stood there with Hall screaming at him and Cobian's body in plain view. Later, defendant asked Officer Ciaciura what "the girl was doing on the ground." His casual obliviousness was further evidence that his perception and judgment were impaired.

¶ 40    The same might be said of his aggressive tailgating, as described by Otto. But that point is hardly necessary, and it adds only little to the already substantial body of evidence, both direct and circumstantial, that defendant was impaired.

¶ 41    Lastly, the opinion testimony of a police officer may be sufficient on its own to support a finding that a driver was impaired, if the officer has the "relevant skills, experience, or training to render such an opinion." (Quotation marks omitted.) *Lenz*, 2019 IL App (2d) 180124, ¶ 117; *Janik*, 127 Ill. 2d at 402. Officer Ciaciura rendered that opinion here. He testified to his ample experience in this field and his training in the administration of field sobriety tests. The trial court found him credible and agreed with his conclusion. There was more than enough evidence

for a rational trier of fact to find that defendant was impaired, or under the influence of alcohol, when he crashed into Cobian's car.

¶ 42    Defendant's cursory arguments to the contrary are unconvincing. Yes, there were times when he managed to stand straight and walk "without support," as he is keen to point out. But the fact that he was not completely falling over at every moment—or the fact that his speech was comprehensible—hardly shows that he was sober enough to exercise " 'ordinary care' " as a driver. See *Gordon*, 378 Ill. App. 3d at 631. Defendant holds himself to a dangerously low standard.

¶ 43    Defendant acknowledges that he "exhibited signs of impairment" during the sobriety tests, but he argues that those signs can all be explained away by the fact that he was 67 years old and purportedly suffered a head injury during the accident. As for his age, Officer Ciaciura did acknowledge that being 65 or older can sometimes adversely affect a person's performance on the tests. As for his purported head injury, defendant points out that his windshield was cracked, and what appeared to be hair was stuck inside one of the cracks. That said, he denied that he was injured when the officer asked, and he showed no visible evidence of a head (or other) injury on the dash-cam video.

¶ 44    Whatever merit these points may have, they can only carry defendant so far. There was ample evidence of his impairment, aside from the fact that he failed the sobriety tests, and he cannot explain all of *that* evidence away. He not only failed the tests, he also persistently failed to follow instructions. He drove aggressively. He had blood-shot eyes and alcohol on his breath. He had an open bottle of vodka in his truck, and he threw it to the side of the road when he thought nobody was looking. His BAC was (still) over the legal limit later that night, after spending five hours in the company of the police. He lied at least twice about his drinking that

evening, though he eventually admitted that he *was* drinking before the crash. He was casual, almost jovial, in the aftermath of the accident, and oblivious to the gravity of the situation.

¶ 45    The evidence of impairment in this case, while in some instances circumstantial, came from all directions. And that fact, among others, readily distinguishes it from defendant's cited authorities. Briefly, in *People v. Clark*, 123 Ill. App. 2d 41, 43-45 (1970), the defendant's head went "through" the windshield; he was found "unconscious," with a bloody head and face; and he was taken to the hospital. There, he was found to be "stumbling" and "swaying" and "thick-tongued" when he regained consciousness. In these circumstances, his defects in gait and speech could not reliably be attributed to the alcohol that was apparent on his breath, which meant that the smell of alcohol was the *only* evidence of impairment in the case. On its own, that is not enough. *Id.*

¶ 46    In *People v. Holtz*, 19 Ill. App. 3d 781 (1974), as in *Clark*, there was little more than the smell of alcohol to go on. The codefendant, Lunsford, was convicted of a DUI after Holtz, his passenger, grabbed the steering wheel and caused a crash. *Id.* at 787. According to the officer, Lunsford had alcohol on his breath and his movements were unsteady. *Id.* at 788. But Lunsford did not take, much less fail, any sobriety tests. And his unsteady movements could have been the result of his injuries: he required "emergency treatment" for a head injury and also "injured his knees." *Id.*

¶ 47    So too for the defendant in *People v. Winfield*, 15 Ill. App. 3d 688, 689-90 (1973), who had alcohol on his breath and "sway[ed]" when he walked—perhaps because he was knocked "temporarily unconscious" and "dislocated [his] knee cap," among other injuries to his finger, shoulder, and face. But here, defendant appeared uninjured and insisted that nothing prevented him from walking normally right before he failed the walk-and-turn test.

¶ 48    The facts of *People v. Wallace*, 133 Ill. App. 2d 297 (1971), hardly bear mention. The

defendant "staggered" out of a restaurant, with alcohol on his breath, after crashing his car into a

tree. *Id.* at 298-99. But there was undisputed evidence that he went to the restaurant to call his

wife for a ride and "drank some beer" while he waited for her. He also lost a substantial amount

of blood from his head wound, which also could have caused him to stagger. *Id.* There was no

evidence, just "mere speculation," that he drank anything *before* the crash. *Id.* at 299.

¶ 49    In sum, the evidence of impairment in this case was too substantial, and too varied, for

defendant to explain it all away. It was sufficient to convict him of (aggravated) DUI.

¶ 50                                        II

¶ 51    Defendant also claims that the State failed to prove proximate cause. To convict

defendant of *aggravated* DUI, the State had to prove that his underlying DUI offense—that is,

his impaired driving—"was a proximate cause of [Cobian's] death." 625 ILCS 5/11-501(d)(1)(F)

(West 2020). This element requires proof of causation in fact and legal causation. *People v.*

*Johnson*, 392 Ill. App. 3d 127, 131 (2009). Causation in fact is not at issue; defendant's claim is

rather that his impaired driving was not a legal or proximate cause of Cobian's death.

¶ 52    Legal or proximate causation is established " 'if an injury was foreseeable as the type of

harm that a reasonable person would expect to see as a likely result of his or her conduct.' " *Id.*

(quoting *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 7 (2006)).

¶ 53    It bears emphasis that the impaired driving must be "*a* proximate cause of the death."

(Emphasis added.) 625 ILCS 5/11-501(d)(1)(F) (West 2020). It need not be " 'the sole and

immediate cause.' " *Johnson*, 392 Ill. App. 3d at 130 (quoting *People v. Merritt*, 343 Ill. App. 3d

442, 448 (2003)). In other words, if there were multiple proximate causes of Cobian's death,

defendant will still be criminally liable for an aggravated DUI if his impaired driving was *one* of them. Comparative negligence is not a defense in a criminal case.

¶ 54    So defendant cannot escape criminal liability just by pointing out that pushing the car on a major road, in these conditions, created a foreseeable risk of collision. With all due respect to the deceased, it *did*, and thus it was *one* proximate cause of death. But our question is whether it was the *only* proximate cause, or whether defendant's impaired driving also played a role for which he can fairly be held responsible.

¶ 55    To this end, defendant argues that he could not reasonably foresee that changing lanes, as described by Otto, would result in the crash that ensued. And that is because he could not see the disabled car before he changed lanes, he could not reasonably anticipate that Cobian and Powell would be where they were, and he could not avoid the crash, since even an unimpaired driver could not have reacted quickly enough once the car became visible.

¶ 56    First, defendant would have us conclude that he could not see the disabled car, owing to some combination of the slight bend in the road, the lighting conditions, and the obstruction (or so he says) of the car's hazard lights by Cobian and Powell. Whatever defendant may argue on this score, the fact remains that Otto, for one, *did* see the disabled car. She could not have been any clearer about this, and the trial court found her credible as a witness. Specifically, Otto saw the car in the right lane as she approached the area of the crash in the left lane. This caused her to slow down and move as far to the left in her lane as she could get, to leave room between her and the hazard she perceived.

¶ 57    Defendant, for his part, was immediately behind Otto. In fact, he was close enough that his tailgating made her palpably uncomfortable. All of which is to say that defendant's position, relative to the disabled car, was not much different from Otto's own. And his vantage point was

a relatively high one, given that he was driving a pickup truck. Unless his view was nonetheless obstructed, it is reasonable to infer that defendant, like Otto, could see the disabled car with enough time to keep a safe distance. If there was any such obstruction, the record gives no hint as to what it may have been.

¶ 58    The fact that it was dark out did not prevent Otto from seeing the disabled car. (Otto had her headlights on, as did defendant.) Nor did the slight bend in the road. Otto did not specifically say whether she saw the car's hazard lights, though she did repeatedly describe it as "disabled." And Powell testified that the hazard lights were on.

¶ 59    Relying on the testimony of his expert, a topic to which we will return shortly, defendant argues that the hazard lights would not have been visible because Cobian and Powell would have been blocking them while pushing the car from behind. Not necessarily. Officer Kisija's dash-cam video shows Cobian and Powell pushing the car into the parking lot. The hazard lights are sometimes visible, sometimes not. It depends on where Cobian and Powell stood, and that changed from moment to moment.

¶ 60    No amount of "expert" testimony can establish that the hazard lights were necessarily and completely blocked when the dash-cam video shows otherwise. Granted, this does not establish that the hazard lights *were* visible when defendant changed lanes. But his expert had no basis to insist that they were *not*. So this is no reason to infer that an alert driver, in defendant's position, could not see Cobian's car. And so far, we have found no other reason to draw that inference.

¶ 61    The rest of the evidence also points to the conclusion that this was not an unavoidable accident for a sober and alert driver. Powell estimated that "maybe 15 or so" drivers passed by in the short time that they pushed the car. Defendant jumps on the uncertainty of the estimate, but there is no reason why Powell would have been counting the passing cars, and the exact number

is immaterial in any event. The point is that, by all accounts, there were numerous cars on this stretch of Lake Street; defendant himself emphasizes the "busy conditions" and "heavy traffic." And the more cars that safely passed Cobian's, the harder it is to believe that this crash was truly unavoidable.

¶ 62   Defendant argues that all the traffic safely passing by says nothing about the ability of a driver in *his* precise location to avoid the crash. After all, he says, we do not know exactly when or where or at what speed the other drivers passed by; nor do we even know what lane of traffic they were in.

¶ 63   Perhaps we know a little more than defendant would care to admit. This, for example: the other cars that passed Cobian were, by that point, all in the left lane. We know this because any car that tried to "pass" her in the right lane would have rear-ended her, just as defendant did.

¶ 64   So at some point, as a matter of necessity, the "heavy traffic" condensed into the left lane. Granted, we cannot know exactly when or where that happened, but it is unrealistic to suppose that, in one lucky coincidence after another, car after car just happened to be in or shift into the left lane for reasons that had nothing to do with the hazard that was plainly visible to Otto in the right lane. Other drivers had to be alert to it, too, which means that the hazard was in general visible—and avoidable.

¶ 65   What's more, this traffic pattern was itself a clue that something was amiss in the right lane. Why else would everyone be condensing into the left lane when the right lane was open? (There were construction-related closures on other stretches of Lake Street, but there is no dispute that the right lane was open here.)

¶ 66   The State says that Otto's slowing down, and her effort to get as far over as possible in the left lane, were two more clues of this kind. We are not so sure about the second one. Drivers

drift in their own lanes for all sorts of reasons, and often for no reason at all, other than perhaps their own momentary inattentiveness. But the general point still stands, even if this particular piece of evidence deserves little weight: for a driver with his wits about him, Cobian's car was visible and avoidable; and the overall traffic pattern should have alerted a sober and prudent driver that a hazard lurked in the right lane.

¶ 67 But defendant did not see Cobian's car, even if Otto (and others) did. He did not take his cues, as he should have, from the other drivers and the flow of traffic. And he did not slow down when Otto did. Instead, he hit the gas, swerved sharply into the right lane, and caused a fatal crash. That decision to change lanes, at that moment and in these circumstances, was the result of impaired judgment and perception. It was a proximate cause, admittedly alongside another, of Cobian's death.

¶ 68 On the other side of the ledger, Cowsert testified for the defense as an expert in the field of automobile accident reconstruction. Cowsert rendered three opinions: (1) the collision was unavoidable by a non-impaired driver in these conditions, (2) the sole cause of the collision was pushing Cobian's car in these same conditions, and (3) Cobian and Powell would have been blocking the rear lights of the car. We have already said enough about the third opinion. And the first two ultimately come to the same thing: Cobian and Powell created a hazard that even a non-impaired driver could not have avoided; thus, defendant cannot fairly be held responsible for the crash that ensued.

¶ 69 Using a modeling program called the Integrated Driver Response and Research (IDRR), and measurements collected by the police, Cowsert offered the following analysis. The IDRR assigns a perception-to-reaction time of 1.8 to 2.5 seconds for a non-impaired driver, depending on the conditions. (Here, he said, defendant's reaction time would have been in the 85th

percentile, though there was no elaboration on the meaningfulness of that number.) At the speed limit of 45 miles per hour, that equates to 119 to 165 feet before a non-impaired driver would begin to take evasive action. Based on this calculation, and the assumptions about roadway conditions plugged into the model, Cowsert concluded that a non-impaired driver would have needed 185 to 231 feet to perceive, react, and avoid the collision.

¶ 70    But the maximum illumination for the headlights on defendant's pickup truck, according to Cowsert, was 126 feet. Thus, Cobian's car would not have been visible to defendant until it was too late for a non-impaired driver, driving at the speed limit, to avoid the crash.

¶ 71    And for what it's worth, based on the tire marks left by the two cars, Cowsert calculated that defendant was driving at a maximum speed of 47.5 miles per hour and possibly less before he began to brake (even at the maximum rate, Cowsert said, his conclusions would stand) and slowed to a speed of 30.5 miles per hour at the point of impact with Cobian's car.

¶ 72    Cowsert's model is riddled with assumptions—that Cobian and Powell were walking at a speed of two miles per hour while pushing the car, that defendant applied the maximum force to his brakes, and more—that leave one wondering. The trial court was also skeptical of the reaction-time figures baked into the IDRR. And the court found that Cowsert generally lacked credibility on the witness stand. But we will put these points aside. We think there are even more urgent problems with Cowsert's analysis.

¶ 73    For one, he assumed that defendant's headlights were the only source of illumination on the road. In the same vein, defense counsel elicited testimony from Cowsert that there were no "sources of artificial illumination" on this stretch of Lake Street. Not quite right. There were no streetlights. But there was "heavy traffic"—and all the headlights that came with it. Cowsert's model proceeds as if the headlights on one car, or even many cars, do nothing to illuminate the

roadway (or its hazards) for other drivers. From the perspective of the driver in Cowsert's model, a roadway full of cars is as dark as an empty one. That assumption alone renders the model dubious at best.

¶ 74 And as far as we can tell, nothing in Cowsert's analysis shows that defendant's decision to change lanes when and where he did was not itself the result of impaired and, thus, defective judgment. Consider this scenario: Cobian's car was visible to someone in defendant's position when he changed lanes, just as it was visible to Otto, but he did not see it because his perception was impaired. For all that Cowsert's analysis can tell us, Cobian's car may have even been illuminated by defendant's own headlights at that time, to say nothing of Otto's, since the analysis does not even purport to establish that defendant had to be more than 126 feet behind Cobian's car when he changed lanes. Defendant could have failed to notice Cobian's car, sped up when he should have slowed down, and changed lanes with insufficient time—perhaps for anyone, according to Cowsert's model—to avoid the collision.

¶ 75 For the reasons we have discussed, a trier of fact could reasonably find that defendant's lane change was an act of negligent driving that resulted from his impairment. And to repeat, Cowsert's analysis does not undercut that inference or the credibility of the witnesses on whose testimony it was based. Putting aside its questionable assumptions, the analysis fails, even on its own terms, to establish that defendant's impaired driving was not a proximate cause of the crash and thus Cobian's death.

¶ 76 Defendant's principal authorities on the topic of proximate cause bear little resemblance to the facts here. In *People v. Mumaugh*, 2018 IL App (3d) 140961, ¶¶ 7, 32, the defendant was neither impaired nor negligent in his driving; he unavoidably hit a pedestrian, despite his swift evasive action, when she suddenly "appeared out of nowhere" and "immediately in front of" his

car, at night, dressed in black. These facts reveal nothing about defendant's ability in this case to avoid crashing into Cobian.

¶ 77    The same is true of *Reuter v. Korb*, 248 Ill. App. 3d 142 (1993). The civil defendant in *Korb* was driving on a " 'notoriously dark' " rural road (not a busy thoroughfare), when a drunk pedestrian in dark clothes, who had been trying to flag down cars, "suddenly" and "unexpectedly" appeared out of nowhere," "in the center of defendant's lane," about 10 feet in front of his car. *Id.* at 146, 150-52. At that distance, and at a (legal) speed of 45 miles per hour, there was no way for the defendant—who was driving "in a normal manner" and not negligently—to avoid hitting the pedestrian. *Id.* at 147, 152-53.

¶ 78    Here, nobody darted out into the road, directly in front of defendant's car. True, Cobian should not have been where she was, as defendant says, but that is as far as the analogy to *Korb* and *Mumaugh* goes.

¶ 79    Lastly, in *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 260-61 (1999), an illegally parked truck was not the proximate cause of the pedestrian's death because it was not reasonably foreseeable that the parking violation would cause the pedestrian to ignore a marked crosswalk, jaywalk in front of the truck, and get hit by a car whose driver could not see her there. This principle of "intervening" causation has no useful application here. See *id.* at 257.

¶ 80    In sum, the evidence was sufficient to prove both impairment and proximate causation. Defendant's conviction for aggravated DUI is affirmed.

¶ 81                                        III

¶ 82    Lastly, defendant argues that the evidence was insufficient to convict him of obstructing justice. "A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he or she knowingly *** [d]estroys, alters, conceals or

disguises physical evidence ***." 720 ILCS 5/31-4(a)(1) (West 2020).

¶ 83    Under our supreme court's precedents, the *conduct* required by the statute—destroying, altering, concealing, or disguising evidence—must also have a certain *result*: it must "actually interfere[ ] with the administration of justice." To put the point differently, it must "materially impede[ ]" the investigation or prosecution of the underlying offense. *People v. Comage*, 241 Ill. 2d 139, 150 (2011); see also *People v. Casler*, 2020 IL 125117, ¶ 31.

¶ 84    The indictment here alleged that defendant obstructed justice when he "removed and discarded bottles from his vehicle" during the initial investigation of the accident. The conduct and intent elements of the offense were proven by the dash-cam video, the vodka bottle with defendant's fingerprints on it, and the plainly obvious inference about *why* defendant took the bottle out of his truck and threw it into the bushes on the side of the road. Defendant does not dispute any of this. His only claim is that his conduct did not materially impede the investigation or the prosecution of his DUI offense.

¶ 85    The key precedent on this issue is *Comage*, 241 Ill. 2d 139. With the police in hot pursuit, the defendant in *Comage* took a crack pipe and push rod out of his pocket and threw them over a fence. *Id.* at 142. He stopped in his tracks and was immediately apprehended, 10 to 15 feet from that point, when an officer threatened to tase him. *Id.* It took all of 20 seconds for an officer to walk around the fence and retrieve the items. *Id.* at 142, 150. Neither this 20-second detour, nor the fact that the incriminating items were so "briefly out of the officers' sight," had anything more than a *de minimis* effect on the officers' investigation and thus did not materially impede it. *Id.* at 150.

¶ 86    *Comage* thus recognized that, without some materiality requirement, even the most trivial delay or inconsequential hurdle encountered by law enforcement could result in a conviction for

obstruction. It is not enough to knock the police off course for a few seconds; the intent to derail the criminal process, in either its investigative or prosecutorial stages, must succeed in some non-trivial way. Law enforcement must be made to take some meaningful step that it would not have been required to take, if not for the defendant's efforts to conceal or otherwise meddle with the evidence.

¶ 87     But the materiality requirement should not be overstated. It does not mean that a defendant is off the hook for obstruction merely because the obstruction was ultimately unsuccessful. A defendant is not automatically exonerated of an obstruction charge simply because the police found the evidence he tried to conceal; because the police still had grounds to arrest him, and did arrest him, before they found it; or because the State successfully prosecuted him for the underlying offense, with or without the evidence in question. The flaw in defendant's argument is in thinking that obstructive conduct must achieve its ultimate aim of putting incriminating evidence out of law enforcement's reach and, thus, successfully avoiding conviction, prosecution, or even arrest in the first instance. To the contrary, any obstacle thrown in law enforcement's way, including one that was overcome, may be enough, as long as it was not something negligible, insubstantial, or trivial—like having to walk around a fence to pick up a piece of evidence that was tossed aside in plain view of the police. See *id.* at 150.

¶ 88     Defendant's other principal citation, *Casler*, 2020 IL 125117, does not purport to tell us *what qualifies as* a material impediment. It simply held that the materiality requirement applies equally to an obstruction charge based on providing false information to the police. *Id.* ¶ 31. Because the trial court thought that the State did not have to prove materiality, the jury was not instructed, and no evidence was received, on this issue. Thus, double jeopardy did not bar a retrial. *Id.* ¶¶ 64-67. *Casler* does not assist defendant.

¶ 89    Here, Officer Slocum's dash-cam captured defendant moving various items, including a cooler, from the cabin to the bed of his pickup truck shortly after the crash. He then rummaged through those belongings, picked up a bottle, and threw it into the bushes after casting a few glances around at the emergency personnel. Seconds later, he took another item from the same spot and threw it into the bushes. It looked like another bottle, but we can table that question.

¶ 90    Apparently, nobody saw him do this at the time, but the officers reviewed the dash-cam footage the next day, went back to the scene of the accident, and found an Absolut Vodka bottle in the bushes. The second item—and defendant's assertions aside, the video shows that there *was* a second item—was not found. The Illinois State Police crime lab found defendant's fingerprints on the object that *was* recovered, the vodka bottle.

¶ 91    In ruling on the motion for new trial, the trial court noted that, unlike in *Comage*, there was a delay in recovering the bottle until the next day. What's more, the police had to return to the scene, search the brush, and photograph and fingerprint the bottle. In the trial court's eyes, these facts distinguished the case from *Comage* and proved that defendant materially impeded the investigation.

¶ 92    We agree that defendant's obstructive conduct is meaningfully different from *Comage* and satisfies the relatively low threshold for materiality established in that case. Other than perhaps the photographing of the bottle, which presumably would have taken place regardless of how the police discovered it, we agree that this case presented more than a *de minimis* example of impeding law enforcement's investigation: the delay in recovering evidence was not fleeting, as in *Comage* (the next day as opposed to 20 seconds), the police had to search for the bottle (versus just bending down to pick something up), and they had to return to a scene they had already left (as opposed to walking around an adjacent fence).

- 23 -

¶ 93    And the most decisive difference, in our view, is that defendant's obstructive conduct also required the police to undertake an otherwise unnecessary forensic analysis—taking fingerprints off the bottle—to link him to the incriminating evidence that he moved and tried to conceal, which likely would have been unnecessary had they recovered the bottle in his vehicle.

¶ 94    Without the forensic fingerprinting analysis, the State could not have proven that the bottle that defendant tossed from his vehicle was that very vodka bottle. And the point is not just how long it took to test the bottle for fingerprints, but that defendant's obstructive conduct required law enforcement to obtain new evidence and prove a new fact—that his fingerprints were on the bottle, proving that it was the same bottle once inside the cabin of his pickup and later discarded—so the State could introduce that incriminating evidence at trial. If that is not a material impediment to an investigation and prosecution, then we are at a loss to say what is. Defendant's conviction for obstructing justice is thus affirmed.

¶ 95                                    CONCLUSION

¶ 96    The judgment of the circuit court is affirmed.

¶ 97    Affirmed.

## *People v. Olvera*, 2023 IL App (1st) 210875

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-16041; the Hon. Joseph M. Cataldo, Judge, presiding. |
| **Attorneys for Appellant:** | William Beattie, of Law Offices of William Beattie, Ltd., of Mount Prospect, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Daniel Piwowarczyk, and Justin Erb, Assistant State's Attorneys, of counsel), for the People. |