2024 IL App (2d) 200486-U
No. 2-20-0486
Order filed February 27, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-DT-78 |
| | ) | |
| DANIEL C. JENSEN, | ) | Honorable |
| | ) | Joseph Voiland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was proved guilty beyond a reasonable doubt of the charge of DUI. Even if evidence of allegedly "severely compromised" blood draw and BAC result is not considered, trial court's finding of guilt of driving under the influence of alcohol under section 5/11-50l(a)(2) of the Vehicle Code was not against the manifest weight of the evidence, which included testimonies and video of erratic driving and defendant's physical characteristics, including bloodshot, glassy eyes and a strong odor of alcohol.

¶ 2    Following a bench trial, defendant, Daniel C. Jensen, was found guilty of driving under the influence (DUI)  pursuant to section 11-50l(a)(2) of the Vehicle Code (Code) (625 ILCS 5/11-50l(a)(2) (West 2016)) and sentenced to 24 months of conditional discharge, 240 hours of public

service work, and two days in jail (with credit for time served). Defendant now appeals from his conviction.[1] We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was arrested along Route 71 in Kendall County on the afternoon of May 27, 2017. After being pulled over, defendant declined to perform field sobriety tests, and he was placed into custody. At the Kendall County jail, defendant also declined to take a breathalyzer test. After one-and-a-half hours, a search warrant for defendant's blood and urine was obtained. Defendant's blood and urine samples were collected and sent to the Illinois State Police (ISP) crime lab for analysis, which occurred on August 29, 2017.

¶ 5    Trial began on January 17, 2019 and continued on many dates until the court found defendant guilty on November 25, 2019. John Kettman testified that he was a passenger in a vehicle on Route 71 at about 1:30 p.m. on May 27, 2017. His wife noticed something about the vehicle behind them, and he looked in the mirror to see a Ford truck 50 to 100 yards behind them. He saw the truck go up to a foot over the double yellow line on the two-lane road and then "multiple times" kick up dust and gravel on the right-hand shoulder. He saw the vehicle shift from left to right at least ten times over a three-to-five-mile stretch. He watched the truck in the rearview mirror, the passenger sideview mirror, and through the back window.

¶ 6    Kettman eventually called 911 to report the erratically driving truck. He did not continue to view the truck during the call. As he was finishing the call, he noticed flashing lights behind the truck, and his wife eventually pulled into a gas station, at which time Kettman saw a police car

_____

[1]Defendant also pleaded guilty to a charge of improper lane usage (625 ILCS 5/11-709 (West 2016)) before the first witness was called at trial.

pull the truck over in a parking lot on the other side of the intersection. He never saw the driver of the truck or the license plate.

¶ 7    Kettman did not talk to the deputy who pulled the truck over that day. Some days later, he spoke to a deputy on the phone. He never told the deputy the distance between his car and the truck. He also did not tell the deputy the number of times that he saw the truck cross the double yellow line, that he saw the truck hit the gravel on the shoulder and throw up dust, or the distance that he had watched the truck behind him. There were cars traveling in the opposite direction while he watched the truck behind him.

¶ 8    Deputy Todd Brautigam of the Kendall County Sheriff's Office testified that he was on duty, driving southbound on Route 71 at about 1:50 p.m. on May 27, 2017, when he saw a northbound dark pick-up truck throwing up dust from the gravel shoulder. As he slowed down and began his maneuver to turn and drive northbound, he saw the truck "almost to the center line in its lane of traffic." As he then proceeded northbound, there were four cars between him and the truck but, as they were all close together, he could still see the truck, which continued to move left and right. Brautigam activated his light bar (which also activated his dashcam), and the cars behind the truck pulled over to the right to let him pass. Once he passed those vehicles, he turned off his light bar.

¶ 9    The truck slowed down as it approached the entrance to a gas station just before an intersection was controlled by a stoplight that was currently red. The truck "went to the right over the white fog line and jerked back over to the left where the truck partially went into the left-hand turn lane for the intersection before it came back into its lane of traffic and stopped." The truck did not use its turn signals. The truck then "started to move forward a little bit and jerked to a stop again." Once the light turned green, Brautigam activated his light bar to make a traffic stop. Using

its turn signal, the truck "made a real wide right turn" into a parking lot and pulled into a parking spot. Brautigam had followed the truck for approximately five miles before he stopped it.

¶ 10    Brautigam identified defendant as the driver of the truck; defendant was the sole human in the truck but was accompanied by his dog. Brautigam described defendant's eyes as appearing glassy and bloodshot, and he noticed a strong odor of alcoholic beverage coming from inside the vehicle. Brautigam explained why he pulled defendant over, and defendant said that he was driving the way that he was because he was playing with his dog. When Brautigam asked for defendant's license and registration, defendant handed him his license and a paper-clipped bundle of papers that his insurance card, registration, and other items. Defendant did not have difficulty producing them. Brautigam had no problem understanding defendant and never had to ask him to repeat himself.

¶ 11    Brautigam went back to his squad car with the paperwork; while he sat in the car, Officer Jeka of the Yorkville Police Department arrived on the scene. Defendant got out of his truck to speak with Jeka. When Brautigam joined them outside of defendant's truck, he could smell a strong odor of alcohol "coming directly from [defendant's] facial area" about two to three feet away. Brautigam asked defendant if he had consumed any alcoholic beverages in the last 12 hours; defendant replied that "it did not matter, that he was screwed." When asked, defendant said that he did not believe that he had consumed any alcoholic beverages from the cup that he was drinking from when he was pulled over. Defendant declined to perform any field sobriety tests; he was then placed under arrest. A search of the truck did not reveal any alcohol or drugs.

¶ 12    After making arrangements for defendant's dog, Brautigam drove defendant to the Kendall County Sheriff's office. No one else was in the car. Brautigam noticed a "strong smell of alcoholic beverage coming from the back" of his car, and he had not noticed that smell before placing

defendant in the car. Once at the Sherriff's office in the jail, defendant refused to take a breathalyzer test. After consulting with his supervisor, Brautigam filled out the paperwork for a search warrant to obtain defendant's blood and urine.

¶ 13 While they waited for the issuance of the warrant, which took approximately 90 minutes, defendant was handcuffed to a bench in the "law enforcement room" of the jail. Shortly after he was so secured, defendant lay down on the concrete bench and fell asleep, although Brautigam could not say for how long. After the warrant was obtained, Tisha Beard, from Illinois Phlebotomy Services, was contacted to perform the blood draw at the jail. Defendant initially said that he would not submit to the taking of his fluids without his attorney being present but later agreed to the tests after being told that he would be restrained, and the fluids collected, if he did not voluntarily comply. Brautigam explained in detail, both in questioning by the State and by defense counsel, the procedures followed in obtaining and handling the blood and urine samples.

¶ 14 Brautigam talked to Kettman the following day. He included this conversation in his report. However, he testified that he did not remember Kettman telling him, and thus did not include in his report, certain things that Kettman had testified to in court, including that he had seen the truck move from its lane to the shoulder 8 or 10 times, that he had watched the truck from his mirrors, or that he had seen the truck throw up gravel from the shoulder at least twice.

¶ 15 Brautigam never asked defendant if anything other than alcohol could have caused defendant's bloodshot, glassy eyes. Although he had asked defendant how much alcohol he had consumed in the last 12 hours, defendant never told him if he had consumed any. Defendant told him that he had had a "rough week" and had fired his son from his job.

¶ 16 Brautigam testified to his DUI training in 2000, his more than 170 DUI arrests during his career, and his status as a DUI training officer since 2016 or 2017. He was questioned extensively

about the procedures involved in the drawing of blood and collection of urine, what he saw and did while defendant's blood and urine were taken, and what he included in his report regarding those issues.

¶ 17   The court also viewed several DVDs including Brautigam's dash cam video and footage of the execution of the search warrant. The dash cam video showed defendant veering from one side of his lane to the other and veering into the left-turn lane at a red light before returning to his lane. Later, the video showed Brautigam's conversation with defendant in the parking lot. Brautigam told defendant that, over a distance of almost five miles, he saw defendant almost drive off the road numerous times and crossing over the center line. He also told defendant that other drivers had called the police to report his driving. Defendant evaded questions about how much alcohol he had consumed, eventually saying that it "doesn't matter." As he was led to the squad car after refusing field sobriety tests, defendant said, "G*d damn it, I got a DUI again." The video of the blood draw showed defendant refusing to comply with requests to draw his blood until he was told that, since a warrant to draw his blood had been issued, he would be restrained and his blood would be drawn if he did not voluntarily comply. Defendant agreed to the draw, and the video showed the blood draw procedure.

¶ 18   Jennifer Ostrom, the evidence custodian of the Kendall County Sherrif's Office, testified that she processed the DUI kit containing defendant's blood and urine samples on May 30, 2017. Ostrom described her training, the condition of the evidence that she received (the DUI kit and video evidence), and how she handled that evidence. She took the DUI kit to the Illinois State Crime Lab in Joliet on June 9, 2017, and retrieved the contents of the DUI kit from the lab on October 12, 2018. She could not testify as to the whereabouts of the evidence after she left it at the lab.

¶ 19    Tisha Beard testified that she was a phlebotomist with Northwestern Medicine.  She detailed her education, certifications, and experience in drawing blood since 2002.  She was required to complete continuing education "every few months" to retain her current job as a phlebotomist.  She described the usual procedures to be followed and equipment used when drawing blood pursuant to a search warrant, then described in detail how she drew defendant's blood on May 27, 2017.

¶ 20    Cynthia Woods testified that she was a forensic scientist in the toxicology section of the Illinois State Police Division of Forensic Services.  After she described her training and experience, she was accepted by the court as an expert in forensic toxicology.  Under extensive questioning from both the State and the defense, Woods described the procedures she followed in receiving, testing, and storing defendant's blood on June 20, 2017.  She opined that the blood alcohol concentration in defendant's sample was 0.256 grams per deciliter.  The State then rested.

¶ 21    Defendant testified on his own behalf.  He testified that he had awoken at 4:30 a.m. on the day in question and left for work as a contracting remodeler with his dog at 6:00.  After meeting a worker for breakfast, he made business calls in Naperville, Aurora, Sandwich and Sheridan before stopping for lunch.  While he did not remember where he had lunch, he remembered that he had a burger and two 12-ounce bottles of Coors Light beer.  He had no other alcohol that day.  After lunch, he stopped at a gas station to buy some mouthwash; he was in sales and used it "chronically."  He then headed home.

¶ 22    As defendant headed northeast on Route 71, his dog began pawing at him and nipping his arm.  Defendant also started "getting a tickled nose hairs [*sic*]," so he drove with one hand while looking in the rearview mirror and trying to pull the hairs out.  The dog continued to nudge him.  Based on playing with the dog and driving as he was, he hit the fog line on the right side of his

lane, causing dust to fly up, and "might have" touched the center line, but did not leave the roadway.

¶ 23    Defendant did not notice a squad car as he drove until he neared the intersection of Route 71 and Route 47, when he saw a squad in his rearview mirror. The sight startled him, and as he continued to watch the squad in his mirror, he "just kind of veered off to the left" and crossed the white line into the left turn lane.

¶ 24    Defendant had watched the dash cam video in court, and he agreed that his truck moved as it was shown in the video. However, alcohol did not cause it. When the light turned green, the squad's lights were activated, and defendant crossed the intersection and turned into a parking lot. He made a wide right turn into the lot so that he could pull directly into an angled parking slot. The dog was still in the front seat with him. He handed the officer his driver's license and a bundle of insurance papers with no hesitation or any "coordination issues." While the officer went back to the squad, defendant thought about "this [0].08 thing;" "I had two beers and some mouthwash, you know, that has alcohol, so I just wasn't going to blow." He got out of his truck, and when the officer came back, defendant told him "I'm not doing nothing." He obeyed everything the officer told him to do. However, he agreed with defense counsel's statement that, as he had "been through it before," he was not "going to do anything for him."

¶ 25    Defendant denied being "in any way impaired." He answered the questions of both officers at the scene. According to defendant, one of the officers asked him why his eyes were bloodshot and glassy. When asked in court how he responded, he stated:

> "I didn't tell him the truth. I didn't tell him really anything, but that's, you know, I just got done pulling nose hairs out of my nose, and I'm sure that's why my eyes were all glossy [*sic*]."

¶ 26    After defendant was arrested, he gave without difficulty information so that the officers could contact his daughter to collect the dog. He had no difficulty getting into or out of the squad. Normally, at about 2:00, he would go home to take a nap, as he had been up since 4:30 in the morning; he was on his way home to do so when he was pulled over about half a mile from his home. He fell asleep at the jail. It was not from alcohol; "[i]t was probably from the hamburger." When he was asked to take a breath test, he told the officer, "I'm not doing nothing." He responded that way because "I had two beers and mouthwash."

¶ 27    Even after being told that the police had obtained a warrant to draw his blood, defendant said, "I'm not doing it." After being told that he would be restrained in order to draw his blood, he "just said, screw it, okay, fine." When asked in court if he believed that the result of his blood test was accurate, defendant responded, "Yeah, I had [0].256, aren't you supposed to be kind of like comatose or something?" He did not believe that he had had that much alcohol, that the result was accurate, or that he was impaired in any way.

¶ 28    On cross-examination, defendant agreed that an officer asked him about alcohol consumption and that he told the officer that he had not had any alcohol. He denied telling the officer that he was not sure whether there was alcohol in the cup inside the truck; it contained only water. He refused to take the breath test, knowing he had only two beers, because, "I don't know, I mean, how many beers is [0].08? I haven't a clue." He had also used mouthwash after lunch, and it could have affected the test. The defense then rested.

¶ 29    In announcing its ruling, the trial court gave an extensive explanation of its finding that defendant had driven under the influence of alcohol. The issue of driving was undisputed, and defendant himself had testified that he had consumed two 12-ounce beers at lunch. The court found that there was "ample evidence of impaired driving that was presented in this case."

Kettman "testified credibly as to defendant's erratic driving," including that "defendant passed over the double yellow, went into the gravel, shifted back and forth, as he put it, on various occasions over a period of four to five miles." Brautigam also testified as to defendant's erratic driving, and his dash cam video also showed some of that driving.

¶ 30    Defendant had also "acknowledged erratic driving, that he was hitting the fog line, and that he might have touched the center line." The court further found defendant's testimony as to why he was driving erratically (ticklish nose hairs) was "not plausible or credible" and found defendant's demeanor at the time of the stop to be "questionable in nature." "[E]ven if the court were to grant credence to defendant's explanation,*** that conduct in and itself would indicate the inability to act with ordinary care," as defendant would have been "trying to remove or giving more attention to a situation with his nose, without paying proper attention to his driving. So the court finds that there was impaired driving."

¶ 31    The court then continued:

> "The court also notes, and most importantly considers whether there's a presumption in this case of the defendant being under the influence of alcohol. Substantial testimony was had regarding the blood draw and subsequent blood test."

After discussing in detail the circumstances surrounding the blood draw, the issues raised by defendant regarding the admissibility of the test results and the potential for the samples to have been tainted, the trial court concluded that "[t]he defendant has provided no evidence that any of these factors or conditions, as I've previous eluded [*sic*] to, had any [effect] on the results of the blood test." Therefore, the court "admitted the blood test into evidence, and has considered" the test result of a blood alcohol level of 0.256 in its determination. Pursuant to section 501.2(b) (3) of the Code, an alcohol concentration of 0.08 or more creates a presumption that the person was

under the influence of alcohol. Defendant failed to offer sufficient evidence to permit the court "to find the non-existence of the presumed fact by preponderance of the evidence." Accordingly, the court found that the State had proven beyond a reasonable doubt that defendant was under the influence of alcohol at the time he was driving.

¶ 32    The court denied defendant's post-trial motion and subsequently sentenced him 24 months of conditional discharge, 240 hours of public service work, and two days in jail (with credit for time served). This appeal followed.

¶ 33                                 II. ANALYSIS

¶ 34    Defendant now contends that the State failed to prove him guilty beyond a reasonable doubt of DUI. When reviewing on appeal the sufficiency of the evidence, we must consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). All reasonable inferences must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. A trier of fact is not required to disregard inferences that flow normally from the evidence at trial and to "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Galarza*, 2023 IL 127678, ¶ 25. This court will not retry the defendant or substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *People v. Conway*, 2023 IL 127670, ¶ 16. Further, we will not overturn a criminal conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id*.

¶ 35    To convict defendant of DUI under section 501(a)(2) of the Code, the State must prove that defendant, while in "actual physical control" of a car, was "under the influence of alcohol." 625

ILCS 5/11-501(a)(2) (West 2016). "A driver is under the influence when his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." (Internal quotation marks omitted.) *People v. Olvera*, 2023 IL App (1st) 210875, ¶ 25. Chemical evidence of intoxication in the form of a breathalyzer or blood test is not required to obtain a conviction; the credible testimony of the arresting officer may be sufficient to prove the offense. *People v. Janik*, 127 Ill. 2d 390, 402 (1989); *People v. Castino*, 2019 IL App (2d) 170298, ¶ 19. Further, a trial court may find a defendant guilty of DUI based on circumstantial evidence. *Olvera*, 2023 IL App (1st) 210875, ¶ 39. "Circumstantial evidence is proof of facts and circumstances from which the trier of fact may infer other connected facts that reasonably and usually follow according to common experience." *Castino*, 2019 IL App (2d) 170298, ¶ 19.

¶ 36    Defendant argues that his demeanor at the time of his arrest, the lack of careful handling of his DUI kit, improper preservation of his blood samples, and significant gaps in the chain of custody of the samples makes the trial court's strong consideration of the statutory presumption of the influence of alcohol "misplaced;" thus, he was not proved guilty beyond a reasonable doubt. We disagree.

¶ 37    We first note that, on appeal, this court reviews the trial court's judgment, not its rationale. See *People v. Reed*, 361 Ill.App.3d 995, 1000 (2005). Thus, the issue is not whether the trial court placed undue reliance on allegedly "severely compromised" evidence in reaching its finding of guilt. We must consider whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Wheeler*, 226 Ill. 2d at 114.

¶ 38    Defendant allocates the vast majority of the argument in his initial brief to attacking the drawing of his blood and the subsequent handling, storing, and testing of the sample that resulted

in a 0.256 blood alcohol level. He then devotes approximately one page of argument to the contention that the video evidence and the testimony of Jensen and Brautigam do not "describe a person with a blood alcohol level of [0].256." However, both of these arguments miss the point. Defendant was charged with DUI under section 501(a)(2) of the Code (625 ILCS 5/11-501(a)(2) (West 2016). To convict defendant of DUI under section 501(a)(2) of the Code, the State must prove that defendant, while in "actual physical control" of a car, was "under the influence of alcohol." *Id.* Blood alcohol level is not a necessary element of this charge. Thus, even if the evidence regarding the blood draw and subsequent blood alcohol result were to be excluded, defendant could be found guilty of DUI based on evidence that he was in actual physical control of a car while under the influence of alcohol. Further, whether the other evidence "describes" a person with a specific BAC is irrelevant. What is important is whether the evidence shows that the defendant was driving under the influence of alcohol, which is defined as the driver's "mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." (Internal quotation marks omitted.) *People v. Olvera*, 2023 IL App (1st) 210875, ¶ 25.

¶ 39 We conclude that the trial court's finding of guilt was not against the manifest weight of the evidence. The trial court specifically made a finding of impaired driving before it ever mentioned evidence regarding the blood draw and the BAC result. The court recapped the testimonies of Kettman, Brautigam, and defendant and the dash cam video of defendant's driving. The court specifically found Kettman credible while finding defendant's testimony "not plausible or credible." The court noted that defendant's erratic driving occurred over a long distance, which was "inconsistent with trying to remove a tickle from your nose or your nose hairs." Further, if credence were to be granted to defendant's explanation, that explanation would "in and itself would indicate the inability to act with ordinary care," driving at a 55-mile-per-hour speed limit

while giving his nose more attention than his driving. The court then found that "there was impaired driving."

¶ 40 We conclude that the court's judgment is not against the manifest weight of the evidence. Both Kettman and Brautigam testified as to defendant's erratic driving, moving left and right in his lane, at times crossing the center double yellow line and driving on the shoulder. Brautigam's dash cam video also showed some of that driving. Defendant admitted to drinking two beers and to erratic driving, while blaming it on his dog and his own attempts to pull hairs from his nose. Brautigam described defendant's eyes as glassy and bloodshot. He noticed a strong odor of alcohol emanating from inside defendant's vehicle when defendant was still in the vehicle, from defendant's "facial area" (about two to three feet away) when defendant was outside of his vehicle, and from the back of his squad car when defendant was seated there. This evidence is sufficient for a rational trier of fact to find defendant guilty of driving under the influence of alcohol under section 5/11-50l(a)(2) of the Code. Therefore, we affirm the judgment of the trial court.

¶ 41                                 III. CONCLUSION

¶ 42 For these reasons, the judgment of the circuit court of Kendall County is affirmed.

¶ 43 Affirmed.